Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CONNIE A. NAGRAMPA,
          *Plaintiff-Appellant,*

v.

MAILCOUPS, INC.; THE AMERICAN
ARBITRATION ASSOCIATION,
          *Defendants-Appellees.*

No. 03-15955

D.C. No.
CV-03-00208-MJJ

OPINION

Appeal from the United States District Court
for the Northern District of California
Martin J. Jenkins, District Judge, Presiding

Argued and Submitted En Banc
September 27, 2005—San Francisco, California

Filed December 4, 2006

Before: Mary M. Schroeder, Chief Judge, Stephen Reinhardt,
Alex Kozinski, Diarmuid F. O'Scannlain,
Sidney R. Thomas, Susan P. Graber, Kim McLane Wardlaw,
Raymond C. Fisher, Ronald M. Gould, Richard C. Tallman,
and Richard R. Clifton, Circuit Judges.

Opinion by Judge Wardlaw;
Partial Concurrence and Partial Dissent by Judge Clifton;
Dissent by Judge O'Scannlain;
Dissent by Judge Kozinski

18885

**COUNSEL**

Kate Gordon & Leslie A. Bailey, Trial Lawyers for Public Justice, Oakland, California; F. Paul Bland, Trial Lawyers for Public Justice, Washington, D.C.; Sanford M. Cipinko, Law Offices of Sanford M. Cipinko, San Francisco, California, for the plaintiff-appellant.

Glenn J. Plattner and Christine S. Oh, Jenkens & Gilchrist, LLP, Los Angeles, California, for the defendant-appellee MailCoups, Inc.

John S. Warnlof, Warnlof & Sumnick, Walnut Creek, California; Shirley M. Hufstedler, Morrison & Foerster, LLP, Los Angeles, California, for the defendant-appellee, American Arbitration Association.

**OPINION**

WARDLAW, Circuit Judge, with whom Chief Judge SCHROEDER, Judges REINHARDT, THOMAS, GRABER, FISHER, and GOULD join, and with whom Judge CLIFTON joins as to Part II-A and II-B:

The question before us is whether a provision to submit to arbitration in a written franchise agreement is valid and enforceable, therefore requiring the district court to stay proceedings and refer the disputed franchise agreement to arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C.

§§ 1-16 (2000). In a now-withdrawn opinion, a three-judge panel of our court held that the unconscionability of an arbitration provision contained in the franchise agreement is a question for the arbitrator to decide. Here, however, the plaintiff did not seek invalidation of the franchise agreement as a whole on grounds of unconscionability; instead she challenged the unconscionability of solely the arbitration provision. Therefore, it was error to hold that consideration of the unconscionability of the arbitration provision was to be determined by the arbitrator.

We review this case en banc to clarify, as the Supreme Court has recently reiterated, that when the crux of the complaint challenges the validity or enforceability of the agreement containing the arbitration provision, then the question of whether the agreement, as a whole, is unconscionable must be referred to the arbitrator. *See Buckeye Check Cashing, Inc. v. Cardegna*, 126 S. Ct. 1204, 1209 (2006); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967). When the crux of the complaint is not the invalidity of the contract as a whole, but rather the arbitration provision itself, then the federal courts must decide whether the arbitration provision is invalid and unenforceable under 9 U.S.C. § 2 of the FAA.[1] The federal courts cannot shirk their statutory obligation to do so simply because controlling substantive state law requires the court to consider, in the course of analyzing the validity of the arbitration provision, the circumstances surrounding the making of the entire agreement. *See Buckeye*, 126 S. Ct. at 1209-10; *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996); *Prima Paint*, 388 U.S. at 403-04. Judge O'Scannlain's dissent mistakenly argues that holding

---

[1]Judge O'Scannlain's dissent acknowledges that Nagrampa challenges the arbitration provision separately and independently from the contract as a whole in two isolated causes of action. Indeed, no cause of action in the complaint alleges that the franchise agreement is invalid because it is a contract of adhesion; nor does Nagrampa seek to invalidate the franchise agreement; nor would it be invalidated if the arbitration provision is deemed unconscionable.

the arbitration agreement unconscionable based partly on a finding that the franchise agreement is a contract of adhesion — the required California law analysis — is a "ground that directly affects the entire agreement." *Buckeye,* 126 S. Ct. at 1208. Judge O'Scannlain's dissent fails to recognize a further aspect of California law that provides for striking unconscionable provisions, while leaving the remainder of the agreement intact, valid, and enforceable.

One must closely examine Nagrampa's complaint and apply California legal principles to understand why striking the arbitration provision does not affect the validity of the franchise agreement at issue. Nagrampa asserts six separate causes of action[2] in her (since removed) state complaint, none of which seeks to invalidate the contract as a whole. Her fifth and sixth causes of action specifically and exclusively challenge the validity of the arbitration provision. Although she argues appropriately under California law that the arbitration provision is procedurally unconscionable based, in part, on its inclusion in a contract of adhesion, Nagrampa does not assert that the entire agreement is unconscionable or invalid; nor does she seek any form of relief from the agreement as a whole. To the contrary, the other four causes of action provide relief only if the franchise agreement is valid and binding upon the parties.

---

[2]A "cause of action" under California law is equivalent to a "claim" under federal law, although the California system is based upon the old code pleading system, which creates differences between the two pleading systems that affect splitting, amendment, and res judicata principles. *See* 4 B.E. Witkin, California Procedure § 25 (4th ed. 2006). Under the federal system, "[t]he word 'claim' denotes the allegations that give rise to an enforceable right to relief." Moore's Federal Practice § 10.03[2][a] at 10-23 (3d ed. 2006); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading which sets forth a claim for relief . . . shall contain . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." ); *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.*, 133 F.2d 187, 189 (2d Cir. 1943) (A claim "denote[s] the aggregate of operative facts which give rise to a right enforceable in the courts.").

Because § 2 of the FAA provides that arbitration agreements are generally valid and enforceable, "save upon such grounds as exist at law or in equity for the revocation of any contract," we are required to turn to California law to address Nagrampa's arguments regarding the unconscionability of the arbitration provision. California law holds that unconscionable provisions generally are unenforceable. Such unenforceable provisions may, however, be severed from any valid and enforceable provisions, even those also contained within the arbitration provision. The district court correctly proceeded to an analysis of unconscionability under California law as a defense to enforcement of the arbitration provision included in Nagrampa's franchise agreement. Because the district court failed to properly apply California law, which has continued to evolve since the district court ruled, we reverse and remand for further proceedings in accordance with this opinion.

# I

In June 1998, Connie Nagrampa received an offering circular from MailCoups, Inc. On August 24, 1998, Nagrampa entered into an agreement with MailCoups to establish and operate a direct mail coupon advertising franchise under Mail-Coups's Super Coups system. The franchise agreement contains a provision requiring the parties to arbitrate, in accordance with the rules of the American Arbitration Association ("AAA"), any dispute that arises out of or relates to the franchise agreement. The arbitration provision further provides:

> [T]his clause shall not be construed to limit Mail-Coups' right to obtain any provisional remedy, including, without limitation, injunctive relief from any court of competent jurisdiction, as may be necessary in MailCoups' sole subjective judgment, to protect its Service Marks and proprietary information. The decision of the arbitrator shall be binding upon the parties and judgment upon the award may

be entered in any court having jurisdiction thereof. The situs of the arbitration proceedings shall be the regional office of the American Arbitration Association which is located in Boston, Massachusetts. The costs of arbitration shall be borne equally by Mail-Coups and Franchisee. Each party shall be responsible for the fees and expenses of its respective attorneys and experts.

In September 2000, after two years of unprofitable operation of her MailCoups franchise, Nagrampa unilaterally terminated the franchise agreement. This contract dispute arose in December 2001 when MailCoups initiated arbitration proceedings by filing a Demand for Arbitration with the AAA, claiming that at the time Nagrampa terminated the agreement, she owed MailCoups in excess of $80,000 in fees. Nagrampa, in turn, charged that rather than making a forty-one percent profit per year, as MailCoups had promised, she incurred over $180,000 in personal debt and had to pay over $400,000 in various fees to MailCoups. Nagrampa states that the forty-one percent profit figure was orally communicated to her by Mail-Coups and that this was not a figure that she had calculated herself. Furthermore, in a letter sent to MailCoups on September 22, 2000, Nagrampa agreed to pay only the amount due on the mailings, which would be reduced by unused Advertising Funds and CoolSavings charges.

MailCoups's initial arbitration demand designated Los Angeles, California, as the hearing locale. In a letter dated February 6, 2002, Nagrampa's attorney objected to the arbitration proceeding. He clearly stated, "We are not ready or willing to proceed with arbitration." He also asserted "serious concerns about the validity of the arbitration clause" and disagreed that Nagrampa was "in fact compelled by the alleged clause to arbitrate." He further objected to the venue selection, requesting that the venue for the arbitration be Contra Costa, California, the county in which Nagrampa operated her MailCoups franchise. He also objected to the arbitration fee

clause. Based on those objections, Nagrampa's counsel refused to file a response to the arbitration.

Following further procedural skirmishes, on September 11, 2002, the AAA case manager notified the parties that the arbitration hearing would take place in Boston, Massachusetts, in accordance with the forum selection clause in the arbitration provision. On October 16, 2002, the arbitrator suggested that arbitration proceed in Fresno, California, as a more cost-efficient and convenient venue. MailCoups vigorously objected to the Fresno venue, and the AAA case manager confirmed that the arbitration would take place in Boston, Massachusetts. After Nagrampa failed to obtain a fee waiver from the AAA, Nagrampa sent a letter indicating that she would not participate in the arbitration proceedings.

Instead, Nagrampa filed this action against MailCoups and AAA in the Superior Court of the State of California, Contra Costa County. Because *Buckeye* instructs that we examine the crux of the complaint to determine whether it is a challenge to the contract as a whole or to the arbitration provision, 126 S. Ct. at 1208, we describe the complaint at length. The first three causes of action allege common law torts: first, Nagrampa claims relief for intentional misrepresentation; second, she claims relief for negligent misrepresentation; and third, she claims relief for fraud and deceit and suppression of fact. For these three causes of action, Nagrampa prays for damages, costs of suit, legal interest, attorney's fees, and any other relief the court might deem proper. The fourth cause of action sets forth allegations that MailCoups violated the California Franchise Law, and Nagrampa again prays for damages, cost of suit, legal interest, attorney's fees, and any other relief deemed proper. Nagrampa's fifth and sixth causes of action specifically challenge the validity and enforceability of the arbitration provision. The fifth cause of action, for violation of the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750-1785, alleges that the arbitration provision is substantially one-sided, does not fall within the reasonable

expectations of Nagrampa, and is unduly oppressive, unlawful, unfair, fraudulent, and unconscionable. Nagrampa further alleges that the arbitration provision is contained within a contract of adhesion, that the AAA has a strong incentive to be biased, and that the arbitration provision denies her and other franchisees due process. For this cause of action, Nagrampa prays for damages, costs of suit, legal interest, attorney's fees, and any other relief that the court might deem proper. The sixth cause of action, for violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200-17208, alleges that Nagrampa is acting as a private attorney general to contest MailCoups's requirement that its franchisees resolve disputes through arbitration. The relief Nagrampa seeks for the sixth cause of action is that "this court preliminarily and permanently enjoin MailCoups Inc. from unilaterally imposing its Arbitration Provision on plaintiff Connie A. Nagrampa" and that she be awarded attorney's fees, costs of suit, and any other relief that the court might deem proper. Nagrampa nowhere in her complaint seeks to have the franchise agreement as a whole invalidated or declared unenforceable.

On January 14, 2003, invoking jurisdiction on the basis of diversity of citizenship, MailCoups removed this action to the United States District Court for the Northern District of California. MailCoups thereafter filed a motion to compel arbitration and dismiss or stay Nagrampa's action, alternatively seeking transfer to the United States District Court for the District of Massachusetts, which Nagrampa opposed principally upon the ground that the arbitration provision is unconscionable.

Although the choice of law clause in article 36.17 of the franchise agreement provides that the governing law is that of the State of Massachusetts, both parties have proceeded throughout the district court and on appeal on the assumption that the franchise agreement is governed by California law. As a result, the district court applied California law in deter-

mining whether the arbitration provision is unconscionable. We will follow suit because the parties through their course of conduct have waived the provision of the agreement that specifies the application of Massachusetts law. *See* 13 Williston on Contracts § 39:27 (4th ed. 2005) (stating that parties to a contract impliedly waive a term through a course of conduct clearly manifesting an intention to waive the term). This principle is recognized both in California, *Daugherty Co. v. Kimberly-Clark Corp.*, 14 Cal. App. 3d 151, 158 (1971), and in Massachusetts, *see Porter v. Harrington*, 159 N.E. 530, 531 (Mass. 1928).

In ruling on the motion, the district court, quoting *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1107 (C.D. Cal. 2002), and citing *Prima Paint*, 388 U.S. at 403-04, properly recognized: "On a motion to compel arbitration, a court cannot consider whether the contract as a whole is unconscionable. Instead, a court is limited to considering whether the arbitration clause in the agreement is unconscionable." Misapplying California law, the district court glossed over the question of whether the arbitration provision is procedurally unconscionable and concluded that procedural unconscionability was not a "dispositive" issue for the motion to compel. The district court addressed only whether the arbitration provision is substantively unconscionable and found that the arbitration provision is both valid and enforceable and that the contract issues were for the arbitrator to decide. Finally, because it found that the parties had agreed to arbitrate in Boston, Massachusetts, not the district in which the court presides, *see* 9 U.S.C. § 4, it dismissed the action, permitting MailCoups to move in the District Court for the District of Massachusetts to compel arbitration.

Nagrampa timely appealed. On March 21, 2005, in a now-withdrawn opinion, a three-judge panel of our court affirmed the district court on grounds different from those upon which the district court relied. *Nagrampa v. MailCoups, Inc.*, 401 F.3d 1024 (9th Cir. 2005). We now address en banc the valid-

ity and enforceability of the arbitration provision in Nagrampa's franchise agreement.

## II

The validity and scope of an arbitration clause are reviewed de novo. *See Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 936 (9th Cir. 2001). Whether a party has waived the right to sue by agreeing to arbitrate is reviewed de novo. *See Kummetz v. Tech Mold, Inc.*, 152 F.3d 1153, 1154 (9th Cir. 1998). A dismissal without leave to amend also is reviewed de novo. *See Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1100 (9th Cir. 2003), *cert. denied*, 543 U.S. 869 (2004) (noting underlying legal determination requires de novo review). We review for clear error the factual findings underlying the district court's decision. *Woods v. Saturn Distrib. Corp.*, 78 F.3d 424, 427 (9th Cir. 1996).

## A.

**[1]** The arbitrability of a particular dispute is a threshold issue to be decided by the courts. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) ("The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.' " (alteration in original) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986))); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547 (1964) ("The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the . . . agreement does in fact create such a duty."). Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In analyzing whether an arbitration agreement is valid and enforceable, "generally applicable contract defenses, such as fraud, duress, or unconscionability,

may be applied to invalidate arbitration agreements without contravening § 2." *Doctor's Assocs.*, 517 U.S. at 687.

**[2]** In *Buckeye*, the United States Supreme Court recognized that challenges to arbitration agreements fall into two categories: (1) those "challeng[ing] specifically the validity of the agreement to arbitrate;" and (2) those "challeng[ing] the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." 126 S. Ct. at 1208. The Court held that "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Id.* at 1209. The complaint in *Buckeye*, unlike Nagrampa's complaint, did not contain claims that the arbitration provision alone was void and unenforceable, but rather alleged that the arbitration provision was unenforceable because it was contained in an illegal usurious contract which was void *ab initio*. *Id.* at 1208. The opinion by the Florida Court of Appeal describes the claims of the plaintiff class in *Buckeye*:

> Appellees do not challenge the validity of the arbitration provision. Rather, they contend that the underlying contract is void ab initio because it is criminally usurious and, therefore, never existed at all. They further argue . . . that a trial court must determine the legal validity of the underlying contract before compelling arbitration.

*Buckeye Check Cashing, Inc. v. Cardegna*, 824 So. 2d 228, 230 (Fla. Dist. Ct. App. 2002). The Supreme Court in *Buckeye* examined the claims alleged in the complaint to determine the nature of the challenge to the validity of the arbitration agreements under § 2 of the FAA. 126 S. Ct. at 1208. It noted that "[t]he crux of the complaint [was] that the contract as a whole (including its arbitration provision) [was] rendered invalid by the usurious finance charge." *Id*. A conclusion that

the agreement was usurious or violated Florida's public policy necessarily would invalidate the entire contract because "Florida public policy and contract law . . . permit no sever[ance] or salvage[ ] [of] parts of a contract found illegal and void under Florida law." *Id.* at 1209 (internal quotation marks omitted). The *Buckeye* Court rejected the application of state severability rules, holding that enforceability of the arbitration agreement cannot turn on state public policy and contract law. *Id.* The Supreme Court further reasoned, that *Prima Paint* had established the proposition that, as a matter of substantive federal arbitration law, "an arbitration provision is severable from the remainder of the contract." *Id.* The Court concluded that "because respondents challenge the Agreement, but not specifically its arbitration provisions, those provisions are enforceable apart from the remainder of the contract." *Id.* Thus, the Supreme Court in *Buckeye* held that the claim that the contract as a whole, including the arbitration provision, was rendered void *ab initio* by the usurious finance charges, was for the arbitrator to decide. *Id.* at 1208-09.

Similarly, in *Prima Paint*, the plaintiff did not include a claim challenging the validity of the arbitration provision, but rather alleged that the contract as a whole was fraudulently induced, rendering the arbitration provision unenforceable. 388 U.S. at 398-400. The Court in *Prima Paint* made clear that "no claim ha[d] been advanced by Prima Paint that F & C fraudulently induced it to enter into the agreement to arbitrate '(a)ny controversy or claim arising out of or relating to this Agreement, or the breach thereof.' " *Id.* at 406 (alteration in original). Because "the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally," the Court held that the dispute was for the arbitrator to decide. *Id.* at 404. However, the Court also held that challenges specifically to the arbitration agreement were for the court to decide:

> [T]he federal court is instructed to order arbitration to proceed once it is satisfied that "the making of the

agreement for arbitration or the failure to comply (with the arbitration agreement) is not in issue." Accordingly, if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the "making" of the agreement to arbitrate—the federal court may proceed to adjudicate it.

*Id.* at 403-04 (footnotes omitted) (quoting 9 U.S.C. § 4 of the FAA).

On the other hand, the Court in *Buckeye* noted approvingly that the claims advanced by the plaintiff class in *Southland Corp. v. Keating*, 465 U.S. 1 (1984), were of the type "challeng[ing] specifically the validity of the agreement to arbitrate," 126 S. Ct. at 1208, and thus were for the court to decide. The plaintiff class in *Southland* alleged violation of the disclosure requirements of the California Franchise Investment Law, Cal. Corp. Code § 31512, arguing that claims brought under the Franchise Investment Law required judicial consideration and, therefore, the arbitration agreement was unenforceable as to such claims. 465 U.S. at 4. The *Southland* Court held that the claims were arbitrable because it "s[aw] nothing in the Act indicating that the broad principle of enforceability is subject to any additional limitations under State law." *Id.* at 11. The Court concluded that "the defense to arbitration found in the California Franchise Investment Law is not a ground that exists at law or in equity 'for the revocation of *any* contract' but merely a ground that exists for the revocation of arbitration provisions in contracts subject to the California Franchise Investment Law." *Id.* at 16 n.11 (quoting 9 U.S.C. § 2 of the FAA).

**[3]** We must "remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds for the revocation of any contract." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627 (1985) (internal quotation marks omitted). Examining the "crux of

the complaint" makes it abundantly clear that Nagrampa's challenge goes specifically, and only, to the arbitration clause. Nagrampa's complaint does not allege a single ground for invalidation of the entire agreement. To the contrary, the very first request Nagrampa makes in paragraph six of her complaint is that "this court decide that the arbitration requirements unilaterally imposed on its franchisees by MailCoups Inc. are each unlawful, unfair, deceptive and unenforceable, and enjoin MailCoups Inc. from unilaterally imposing these requirements on its franchisees." The two arbitration-related claims, her fifth and sixth causes of action, seek to invalidate the arbitration agreement only on the basis of unconscionability. Although Nagrampa makes an allegation in support of her fifth cause of action that the contract is one of adhesion, her contract of adhesion allegation is not a separate cause of action for which Nagrampa seeks independent relief, such as rescission or invalidation of the entire contract.[3] Nor does this

---

[3]Pleading requirements differ between federal law and California law. California law requires that a complaint contain "a statement of the facts constituting the cause of action, in ordinary and concise language," Cal. Civ. Proc. Code § 425.10(a)(1), which explains why Nagrampa's attorney would include the factual allegation that the contract was one of adhesion in support of the cause of action challenging the arbitration agreement as unconscionable, even though she did not seek invalidation of the entire agreement on that ground. On the other hand, "[t]he Federal Rules do not use the term 'cause of action,' and their emphasis is on the factual rather than the 'legal right' aspects of the cause of action." 4 B.E. Witkin, California Procedure § 25 (4th ed. 2006). The Federal Rules do not require that the complaint state all of the facts constituting a cause of action:

> Conspicuously absent from Federal Rule 8(a)(2) is the requirement found in the codes that the pleader set forth the 'facts' constituting a 'cause of action.' The substitution of 'claim showing that the pleader is entitled to relief' for the code formulation of the 'facts' constituting a 'cause of action' was intended to avoid the distinctions drawn under the codes . . . and eliminate the unfortunate rigidity and confusion surrounding the words 'cause of action.'

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216 (3d ed. 2006). Under federal law, the primary aim of the pleading

allegation, though necessary to establish unconscionability of the arbitration provision, serve as a ground that directly affects the entire agreement, unlike the usurious finance ground in *Buckeye*. Prevailing on the fifth or sixth cause of action means only that the arbitration provision is not enforceable; there is absolutely no effect, direct or indirect, on the contract as a whole. In addition, forty-one of the forty-eight General Allegations in Nagrampa's complaint state facts supporting the causes of action challenging arbitration. Although Nagrampa also includes four other causes of action not targeting the arbitration provision, California's strict pleading requirements and rules restricting the splitting of causes of action provided a strong incentive for her to do so.

**[4]** Furthermore, the genesis of Nagrampa's complaint can be found in the arbitration proceedings: Nagrampa filed suit only after MailCoups successfully moved the arbitral venue for the contract claims at issue to Boston and the AAA rejected her petition to waive the arbitral fees. In other words, Nagrampa filed suit only after the very issues rendering the provision unconscionable against her had been resolved. Thus, the crux of Nagrampa's complaint is a challenge to the arbitration provision itself. Where, as here, no claim threatens to invalidate or otherwise directly affect the entire contract, the federal court must decide claims attacking the validity of the arbitration provision, even if substantive state law requires an examination of the making of the entire contract as part of that analysis.

---

requirements is to give fair notice to the other party. Unlike under California law, "[a] reading of *Garcia*, *Conley*, and *Swierkiewicz*, and a host of other cases . . . suggests that the complaint, and other relief-claiming pleadings need not state with precision all of the elements that are necessary to give rise to a legal basis for recovery as long as fair notice of the nature of the action is provided to the opposing party." *Id.* (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Garcia v. Hilton Hotels Int'l*, 97 F. Supp. 5, 8 (D.P.R. 1951)).

Our sister circuits also examine the nature of claims to determine whether they are arbitrable. They hold that, where the causes of action or claims within a complaint are, in essence, an effort to invalidate the entire contract, then the federal court will send the dispute to arbitration. They also hold that where, as here, there are separate and independent claims specifically challenging enforcement of the arbitration provision, then the federal court will proceed to consider the challenge to arbitrability of the dispute.

The plaintiff in the First Circuit case, *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 16 (1st Cir. 1999), alleged that the arbitration provision contained in the Uniform Application For Securities Industry Registration Or Transfer ("U-4 Form"), a prerequisite to work as a securities broker, was unenforceable because it was adhesive. The plaintiff did not seek to invalidate the entire U-4 agreement, but rather argued that the arbitration clause was adhesive and invalid because signing the U-4 was a condition of employment and excision of the arbitration provision was not permitted. *Id.* at 17. The First Circuit did not find it necessary to address whether the plaintiff's contract of adhesion argument was precluded by *Prima Paint*; to the contrary, it proceeded without comment to consider the contract of adhesion argument in determining whether the plaintiff had satisfied the requirements for unconscionability. *Id.* The First Circuit ultimately found the arbitration clause enforceable because the plaintiff failed to satisfy the additional requirements for unconscionability in demonstrating "both a lack of meaningful choice about whether to accept the provision in question, and that the disputed provisions were so onesided as to be oppressive." *Id.* (internal quotation marks omitted).

Similarly, the Second Circuit considered a plaintiff's claim that the arbitration provisions of the London Metal Exchange Rules were unenforceable because the contracts which incorporated them were contracts of adhesion. *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 249 (2d Cir.

1991). Like Nagrampa, the plaintiff there did not seek to invalidate the entire contract on the basis of adhesion but to strike its arbitration clause. *Id.* The Second Circuit considered the contract of adhesion claim and ultimately rejected it because, "[f]or an arbitration provision to be stricken as a contract of adhesion there must be a showing of unfairness, undue oppression, or unconscionability." *Id.* (internal quotation marks omitted).

The Third Circuit examined a contract of adhesion allegation while analyzing the procedural unconscionability of an arbitration provision in a wrongful discharge and employment discrimination suit. *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 265 (3d Cir. 2003). The complaint filed by the plaintiff class contained five causes of action under Virgin Islands law. *Id.* at 261. The plaintiffs alleged that the arbitration provision in the employment agreement was unenforceable as a contract of adhesion presented to them on a "take-it-or-leave-it" basis as a condition of employment, unconscionable, and offensive to public policy by forcing plaintiffs to arbitrate statutory claims. *Id.* at 261-62. Like Nagrampa, the plaintiffs did not allege that the entire employment contract was an invalid contract of adhesion. *Id.* The Third Circuit found that because an "agreement to arbitrate may be unenforceable based on a generally applicable contractual defense, such as unconscionability," the court had the authority to consider plaintiffs' arguments that the arbitration provision was invalid. *Id.* (citing *Doctor's Assoc.*, 517 U.S. at 687). The Third Circuit then proceeded to hold that the arbitration provision was procedurally unconscionable under Virgin Islands law because "[a] multinational corporation presented [the plaintiffs] with an agreement to arbitrate without providing any opportunity to negotiate its terms," and thus, the agreement was one of adhesion. *Id.* at 265, 270. The court further ruled that the arbitration provision was substantively unconscionable because it limited the time in which to bring a claim, limited the damages and fees awardable to plaintiffs, and required the losing party to bear the costs of arbitration. *Id.* at 266-71. Because

unconscionability permeated the agreement to arbitrate, the Third Circuit refused to sever the unconscionable provisions or to enforce the arbitration clause, and remanded the case to the district court for resolution of plaintiffs' claims. *Id.* at 270-72.

The Fifth Circuit likewise has considered defenses to arbitration provisions that implicate the entire contract, but has limited its consideration to claims which challenge the enforceability and validity of the arbitration provision. In *Washington Mutual Finance Group, LLC v. Bailey*, 364 F.3d 260 (5th Cir. 2004), the plaintiffs, who were illiterate, filed suit against Washington Mutual, alleging primarily that they had been sold and charged for insurance that they did not need or want. *Id.* at 262. In defense to a motion to compel arbitration, plaintiffs claimed that Washington Mutual had fraudulently induced them into entering into the agreements to arbitrate by misrepresenting the nature of the documents that they were signing. *Id.* at 265. The district court denied Washington Mutual's motion to compel arbitration, finding that the arbitration provision was procedurally unconscionable and thus unenforceable. *Id.* at 268. On appeal, the Fifth Circuit rejected Washington Mutual's argument that plaintiffs' fraudulent inducement claim was for an arbitrator to decide under *Prima Paint* and *Primerica Life Insurance Co. v. Brown*, 304 F.3d 469, 472 (5th Cir. 2002). The Fifth Circuit explained that in both *Prima Paint* and *Primerica Life Insurance Co.*, the claims asserted applied to the entire contract and were therefore part of the underlying dispute, whereas, the *Washington Mutual* plaintiffs' claim "relates specifically to the arbitration agreement, [and therefore] a federal court may consider the [claim] as it relates to the making and performance of the agreement to arbitrate." *Wash. Mut. Fin. Group*, 364 F.3d at 266 n.4 (internal quotation marks omitted). The Fifth Circuit ultimately held that the arbitration provision was enforceable, but only because the *Washington Mutual* plaintiffs had not fulfilled their legal obligation to read the contract or have someone read it to them, and thus could not advance

a claim of oral misrepresentation or fraudulent inducement under Mississippi law. *Id.* at 266.

In the Sixth Circuit case, *Burden v. Check Into Cash of Kentucky, LLC*, 267 F.3d 483, 486 (6th Cir. 2001), the plaintiff class alleged that defendants loaned money at usurious interest rates through a scheme where the defendants would provide cash in exchange for a check written for a higher amount. If the customer did not have sufficient funds to cover the check at the payment date, defendants would permit the borrower to "roll-over" the debt and execute a new loan agreement, paying an additional service fee. *Id.* Plaintiffs' complaint alleged violations of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601-1667f, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968, and several consumer protection statutes under Kentucky law. *Burden*, 267 F.3d at 486. In defense to a motion to compel arbitration, plaintiffs alleged that the arbitration provision was unenforceable because the initial loan agreements that they had signed did not include an arbitration provision. *Id.* at 487. Plaintiffs became aware of the provision, which defendants had added to the reverse side of the "roll-over" loan agreements, only when defendants attached it to their motion to compel. *Id.* The Sixth Circuit, however, rejected this claim because the "[p]laintiffs offer[ed] no legal authority for the position that Defendants had a duty to inform them of their insertion of the arbitration clauses." *Id.* at 491 n.2. Plaintiffs additionally alleged that the arbitration provision was used to further defendants' overall fraudulent scheme and, alternatively, that the provision would impose burdensome costs on unsophisticated consumers of limited education, deny statutory rights, and constitute an uninformed waiver of jury trial rights. *Id.* at 491-92. The Sixth Circuit rejected the fraudulent scheme defense to arbitration because "[p]laintiffs fail[ed] to identify, in connection with the alleged fraudulent scheme, any misrepresentation particular to the arbitration agreements, separate from the loan agreements." *Id.* at 491. However, the Sixth Circuit held that the alternative grounds offered by the

plaintiffs attacked the enforceability of the arbitration clause itself, separate from the underlying loan agreements, and thus required a remand to the district court to decide in the first instance. *Id.* at 492-93.

The Sixth Circuit employed similar reasoning in *Stout v. J.D. Byrider*, 228 F.3d 709, 713-15 (6th Cir. 2000), where the plaintiff class alleged that the defendant vehicle sales and leasing company engaged in a standard practice of misrepresenting the quality and value of the used vehicles sold and the cost and value of warranties purchased. Plaintiffs' complaint alleged violations of the TILA, the Ohio Consumer Sales Practices Act ("OCSPA"), Ohio Rev. Code § 1345.01, and common law fraud. *Stout*, 228 F.3d at 713-14. In defense to arbitration, plaintiffs claimed that the arbitration agreements were unconscionable and unenforceable because they were against Ohio public policy. *Id.* at 715-16. The Sixth Circuit found that Ohio public policy could not mandate judicial resolution of the claims because there is "nothing in the [FAA] indicating that the broad principle of enforceability is subject to any additional limitations of state law." *Id.* at 716 (internal quotation marks omitted). The court further found that plaintiffs' claims for fraud and for violations of the OCSPA and the TILA arose under the purchase and finance contracts as a whole and, thus, were arbitrable absent a showing under Ohio law that the arbitration provision itself was unconscionable. *Id.* However, the Sixth Circuit asserted that had plaintiffs alleged that the contract was one of adhesion, the court could address it. *Id.* But, "[i]n the absence of any factual evidence that these agreements were entered into fraudulently or mistakenly, and absent any showing by Plaintiffs that the arbitration arrangements are themselves one-sided or unfair," the plaintiffs' claims were arbitrable. *Id.*

The Eighth Circuit has also required federal courts to examine claims made by a party seeking to invalidate an arbitration clause in order to determine whether the claims of invalidity go to the contract as a whole or relate specifically

to the arbitration provision. In *Madol v. Dan Nelson Automotive Group*, 372 F.3d 997, 998 (8th Cir. 2004), the plaintiff class alleged that in the course of selling and financing vehicles, defendants had violated Iowa consumer protection statutes and the federal TILA, and committed common-law fraud. In response to a motion to compel arbitration, plaintiffs argued that the dispute resolution agreement ("DRA") that they had signed was invalid because the vehicle transactions as a whole were unconscionable. *Id*. The plaintiffs argued that they were given no choice as to what they signed, and that they were overwhelmed by the sheer magnitude of the paperwork and number of clauses per document. *Id.* Unlike Nagrampa, the plaintiffs in *Madol* made no independent challenges to the DRA itself, and "plaintiffs acknowledged in a hearing before the district court that they were not arguing that the DRA [was] 'in and of itself invalid,' but that their theory was that 'the transactions as a whole from start to finish' were unconscionable." *Id.* at 1000. The Eighth Circuit thus held that "plaintiffs' arguments that their vehicle purchase transactions were generally unconscionable were subject to resolution by an arbitrator, absent a showing by the plaintiffs that the DRA, standing alone, was invalid." *Id.*

The only circuit that appears to be at odds with this approach is the Eleventh. In *Jenkins v. First American Cash Advance of Georgia, LLC*, 400 F.3d 868, 877 (11th Cir. 2005), *cert. denied*, 126 S. Ct. 1457 (2006), the plaintiffs, like the putative plaintiff classes in *Buckeye* and *Burden*, had entered into a series of "payday loans"— small-dollar, short-term loans with high interest rates used to obtain cash advances. *Id.* at 871. Each time the plaintiff had obtained a loan, she was required to sign a promissory note and an arbitration agreement that obligated her to submit all disputes between the parties to binding arbitration under the FAA. *Id.* at 871-72. As in *Buckeye*, the plaintiff filed a complaint challenging the contract as a whole. *Id.* at 872-73. The *Jenkins* plaintiff alleged that the payday loan agreements violated Georgia's usury statutes, Ga. Code Ann. §§ 7-4-2, 7-4-18

(2004), and that the loans violated the Georgia Racketeer Influenced and Corrupt Organizations Act, Ga. Code Ann. § 16-14-4. *Id.* at 873.

When the defendants removed the case to federal court and sought to enforce the arbitration agreement, the plaintiff asserted that the FAA did not apply to the loan agreements at issue, that the arbitration agreements were unconscionable, and that the arbitration agreements were unenforceable because the underlying payday loans were illegal and void *ab initio* under Georgia law. *Id.* at 873-74. In assessing the unconscionability of the arbitration provision, the Eleventh Circuit concluded that the plaintiff's contract of adhesion claim challenged the validity of the loan agreements as a whole, not the arbitration agreements specifically. *Id.* at 877. The "adhesion arguments were (1) that the consumers lacked bargaining power because these type[s] of consumer loans . . . would only appeal to extremely desperate consumers, and (2) that the consumers were allegedly unable to negotiate the terms and conditions of the preprinted agreements." *Id.* (internal quotation marks omitted and alteration in original). The Eleventh Circuit applied *Prima Paint* and *Benoay v. Prudential-Bache Securities., Inc.*, 805 F.2d 1437, 1441 (11th Cir. 1986), which hold that if the unconscionability claims " 'pertain to the contract as a whole, and not to the arbitration provision *alone*,' " then those claims should be decided by the arbitrator. *Jenkins*, 400 F.3d at 877 (quoting *Benoay*, 805 F.2d at 1441) (emphasis added). In *Jenkins*, the Eleventh Circuit therefore held that "the FAA does not permit a federal court to consider claims alleging the contract as a whole was adhesive." *Jenkins*, 400 F.3d at 877.

The Eleventh Circuit may have applied *Prima Paint* too broadly by requiring that the contract of adhesion claim pertain specifically and exclusively to the arbitration agreement. The Supreme Court has clarified that to decide whether the federal court or the arbitrator will hear the claims, we are to determine whether the crux of the complaint is a challenge to

the arbitration clause itself or the validity of the contract as a whole. *Buckeye*, 126 S. Ct. at 1208-09. The Supreme Court did not require that the claims in the complaint address the arbitration agreement alone.[4] *Id.*

Judge O'Scannlain's dissent misconstrues the holdings of our sister circuits. The dissent asserts that the Second Circuit in *JLM Industries, Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 170 (2d Cir. 2004), refused to consider a contract of adhesion claim that did not apply to "the arbitration clause alone." However, the dissent disregards the significant fact that JLM's sole challenge to arbitration was that the contract as a whole was one of adhesion. Indeed, JLM did not assert any independent claim specifically directed to the invalidity of the arbitration clause contained in the contract. *Id.* at 170. As the Second Circuit itself noted, "[a]lthough JLM's brief is not wholly clear on this point, we understand its argument to be that the [standard form charter contract] as a whole amounts to a contract of adhesion, rather than that the arbitration clause alone so qualifies." *Id.* at 169. The Second Circuit further explained that "there is no indication [in JLM's arguments] that the arbitration clause *itself* is an unconscionable or oppressive term of adhesion." *Id.* at 170 n.5. The Second Circuit distinguished between a claim that the entire contract was invalid as a contract of adhesion, as opposed to a claim that the arbitration clause itself was adhesive. " 'For an arbitration provision to be stricken as a contract of adhesion there must be a showing of unfairness, undue oppression, or unconscionability.' " *Id.* (quoting *David L. Threlkeld*, 923 F.2d at 249). Here, Nagrampa, unlike JLM, argues that the arbitration provision itself is procedurally and substantively unconscionable because she was unaware of its existence and that it was

---

[4]Indeed, it would be absurd to require that the complaint allege only claims attacking the arbitration agreement and not also include any other claims related to the contract. Moreover, as discussed *infra* at n.5, a California state plaintiff would be precluded from doing so by California's pleading requirements.

hidden on page twenty-five of a thirty-page agreement. If Nagrampa, like JLM, had made *only* a claim that the entire contract was invalid because it was a contract of adhesion, we certainly would agree with our dissenting colleagues that it would be a question for the arbitrator to decide.

Nor can *Rojas v. TK Communications, Inc.*, 87 F.3d 745, 749 & n.3 (5th Cir. 1996), bear the weight that Judge O'Scannlain's dissent assigns to it. In *Rojas*, the Fifth Circuit found that the plaintiff's contract of adhesion claim was solely a challenge to the entire contract and not specifically directed to the arbitration clause. *Id.* at 749 n.3. While the court acknowledged that Rojas had attacked the arbitration clause in her brief, the *Rojas* court did not indicate whether she had made a claim challenging the procedural or substantive unconscionability of the arbitration clause itself. *Id.* Therefore, when the *Rojas* court held that the claim was for the arbitrator to resolve, it was discussing a claim that challenged the validity of the contract as a whole.

Judge O'Scannlain's dissent also misreads the Sixth Circuit's statement in *Burden*, that " 'the grounds for revocation must relate specifically to the arbitration clause and not just to the contract as a whole.' " 267 F.3d at 492-93 (quoting *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938 (4th Cir. 1999)). However, the *Burden* court did not say that the grounds for revocation must relate *only* to the arbitration clause; it said that the grounds for revocation must be asserted *separately* as to the arbitration clause "and not *just* to the contract as a whole." *Id.* (emphasis added). Unlike the plaintiffs' claims in *Burden*, Nagrampa's claims of procedural and substantive unconscionability attack the arbitration provision itself, separate and apart from the underlying contract.

Furthermore, the Eighth Circuit holdings in *Houlihan v. Offerman & Co.*, 31 F.3d 692, 695 (8th Cir. 1994) and *Madol*, 372 F.3d at 1000, are consistent with our majority opinion, not with Judge O'Scannlain's dissent. In *Houlihan*, the plain-

tiffs' sole argument was that they had been fraudulently induced to enter into the contract; none of their claims separately and independently challenged the arbitration clause. 31 F.3d at 695. Similarly, in *Madol*, the claims of invalidity went only to the contract as a whole, as the plaintiffs themselves acknowledged. 372 F.3d at 1000.

**[5]** We do not construe either *Buckeye* or *Prima Paint* to stand for the principle that if plaintiffs challenge an arbitration provision as unenforceable due to unconscionability, they may not include additional contractual or statutory claims in their complaint.[5] An argument that the arbitration agreement itself is procedurally unconscionable may be informed, as required by California state substantive law, by a determination of whether it is contained within a larger contract of adhesion. If the district court decides that the arbitration provision is unenforceable, then the remaining claims that address the contract as a whole were never properly arbitrable; a claim such as fraud in the inducement would lie within the jurisdiction of the district court. The district court also has the discretion under federal arbitration law, *Buckeye*, 126 S. Ct. at 1209, as well as under California law, Cal. Civ. Code § 1670.5, to sever the unconscionable arbitration provision and enforce the remainder of the contract. If, on the other hand, the district court decides that the arbitration agreement is valid and enforceable, then it should stay or dismiss the action pending arbitration proceedings to allow the arbitrator to decide the remaining claims, including those relating to the

---

[5]Indeed, California pleading requirements prohibit plaintiffs from splitting causes of action into separate suits. *See Crowley v. Katleman*, 8 Cal. 4th 666, 682 (1994) ("[N]umerous cases hold that when there is only one primary right an adverse judgment in the first suit is a bar even though the second suit is based on a different theory or seeks a different remedy." (citations omitted)); *see also* 4 B.E. Witkin, California Procedure § 25 (4th ed. 2006) ("The special situations presented by the rule against splitting a cause of action sometimes make it necessary to say that the same set of facts will, for one purpose, constitute only one cause of action, but for other purposes may be regarded as creating multiple causes.").

contract as a whole. Finally if, after examining the crux of the complaint, the district court concludes that the challenge is not to the arbitration provision itself but, rather, to the validity of the entire contract, then the issue of the contract's validity should be considered by an arbitrator in the first instance. *Buckeye*, 126 S. Ct. at 1208-09.

[6] Throughout the course of these proceedings—before the AAA, the district court, and on appeal—Nagrampa has continuously challenged the validity of the arbitration provision separate from any litigation over the entire contract. Unlike the complaints in *Jenkins* and *Buckeye*, Nagrampa's complaint asserts two causes of action specifically challenging only the arbitration provision. Nagrampa's first, second, third, and fourth causes of action are claims for relief under the contract and, thus, are not before us. However, Nagrampa's fifth and sixth causes of action are directed specifically to the arbitration provision, placing these challenges squarely within the category of claims that must be decided by a federal court. *Buckeye*, 126 S. Ct. at 1208-10. In addition, Nagrampa, in her appellate brief, further emphasizes the substantively unconscionable aspects of the arbitration provision, arguing that the arbitration provision is one-sided and that the venue and cost provisions are unfair. While Nagrampa argues that the arbitration provision is procedurally unconscionable because it is contained in a contract of adhesion, nowhere in her complaint does she seek rescission or invalidation of the entire contract based on it being a contract of adhesion.**⁶** Therefore, Nagram-

---

**⁶**Judge O'Scannlain's dissent disregards what the Supreme Court plainly said in *Buckeye* and *Prima Paint*—that we must look to the *complaint* to determine whether the validity of the arbitration provision is in jeopardy. The obvious reason for the Court's instruction is that relief is granted, or not, as to *claims*, or under California law, *causes of action*. The type of claim asserted in the complaint dictates the nature of the relief that may be afforded to the plaintiff. Nagrampa does not assert any claim for which the appropriate relief would be invalidation of the entire franchise agreement. The inclusion of language in the remedies section seeking "such other and further relief as the court may deem proper" is mere

pa's contract of adhesion argument may be addressed insofar as it bears on the question of procedural unconscionability of the arbitration provision.

## B.

Before we reach the question of whether the arbitration agreement is unconscionable under California law, we detour to address MailCoups's argument that Nagrampa "voluntarily participat[ed] in arbitration proceedings . . . without objecting to the arbitration" and therefore waived her right to challenge the arbitrability of the dispute.[7]

As a factual matter, MailCoups is wrong. Nagrampa's counsel's first act was to object to proceeding with arbitration, stating: "We are not ready or willing to proceed with arbitration." He also asserted "serious concerns" about the validity of the arbitration provision and his disagreement with the notion that "we are in fact compelled by the alleged clause to arbitrate." He further specifically objected to the venue and fee provisions, although he left open the possibility of negotiating those issues.

Nagrampa's "participation" in the arbitration proceedings thereafter was minimal, limited to procedural issues and undertaking certain actions to preserve her rights.[8] Nagram-

---

boilerplate, meant to cover all bases as to the claims asserted in the complaint. That boilerplate language does not constitute a claim not already asserted in the complaint, as Judge O'Scannlain suggests. It hardly needs to be said that an attorney's arguments also do not constitute a claim if they are not asserted in the complaint.

[7]We note that the district court elected not to reach the question of waiver and the three-judge panel, by addressing the unconscionability of the arbitration agreement on the merits, implicitly rejected MailCoups's waiver argument.

[8]It is ironic that Nagrampa's very efforts to amicably resolve the question of the substantive unconscionability of the arbitration provision and to preserve her rights have been twisted by MailCoups into an alleged waiver of those rights.

pa's "participation" consisted of a letter to seek a ninety-day continuance, a letter objecting to the validity of the arbitration provision (specifically its venue and fee clauses), one conference call that resulted in a scheduling order, an unsuccessful attempt to file a counter-demand, that was not accepted when she could not afford to pay the fee demanded by the arbitrator, and one set of discovery requests. Both the counter-demand and discovery requests were filed to avoid losing her right to do so in the event the venue, fee, and costs issues were amicably resolved before the proceeding reached the merits of the contract dispute.

The record clearly demonstrates that only two telephonic preliminary[9] hearing conferences were held, and that Nagrampa was present during only one of the two.[10] On June 20, 2002, the arbitrator scheduled the first conference call for the first week of July 2002. On June 23, 2002, Nagrampa notified the arbitrator that her attorney would not be available. On July 2, 2002, the hearing took place in the absence of both Nagrampa and her attorney. Nagrampa was present during a second preliminary conference call held on July 30, 2002.

On August 15, 2002, AAA sent Nagrampa and MailCoups the arbitrator's scheduling order outlining deadlines that would be "strictly enforced." The deadline for discovery requests was August 30, 2002, the day on which Nagrampa filed her discovery request. The deadline for filing a counterclaim was August 19, 2002; Nagrampa attempted to file her counterclaim on August 15, 2002. In the scheduling order, the arbitrator made clear that the parties were "awaiting a final

---

[9]By definition a "preliminary" hearing conference takes place before a hearing on the merits and deals with preliminary matters, such as scheduling and deadlines. *See* Am. Arb. Ass'n, Commercial Arbitration Rules and Mediation Procedures, R-20 (2003).

[10]Judge Kozinski says there were three teleconferences, but there is no evidence in the record, other than a statement in MailCoups's Motion to Compel, that a third call took place.

decision with regard to the venue" and that the Notice of Hearing would be issued only once venue had been determined. Thus, Nagrampa acted reasonably by filing her discovery request and counterclaim to preserve her rights on the chance that AAA and MailCoups would relent in their efforts to impose the one-sided and onerous fee, venue and associated costs clauses upon Nagrampa. Indeed, venue remained an open issue through October 16, 2002. Although the arbitrator's August 15, 2002 order noted that a third preliminary conference call was scheduled, there is no evidence that this conference occurred. Thus, Nagrampa never participated in any proceedings which even touched the merits of the contractual claims that were to be the subject of arbitration. Although Nagrampa withdrew from arbitration in October 2002, she never withdrew her original objections to the arbitration agreement. She elected instead to include them in her state court complaint filed November 12, 2002.

**[7]** The Supreme Court has defined waiver as the "intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotations omitted). There is no evidence that Nagrampa intentionally relinquished or abandoned her right to object to arbitration. Judge Kozinski attempts to twist Nagrampa's limited participation in preliminary matters—while she maintained her objection to proceeding by way of arbitration at all —into conduct that would constitute a waiver. The evidence simply does not support Judge Kozinski's conclusion.

**[8]** Nagrampa's limited involvement in preliminary matters does not preclude her from challenging arbitrability. The Supreme Court, in *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 946 (1995), considered whether an objecting party had consented to arbitration. The plaintiffs "denied that their disagreement . . . was arbitrable and filed written objections to that effect with the arbitration panel." *Id*. at 941. After the arbitrator rejected the plaintiffs' objections, they participated in the arbitration on the merits and lost. The Court

allowed the plaintiffs to challenge arbitrability because "merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue." *Id.* at 946. Even though the issue in *First Options* was consent, the reasoning is applicable to waiver because the considerations are essentially the same.[11]

Our decision in *Textile Unlimited, Inc. v. A..BMH & Co.,* 240 F.3d 781 (9th Cir. 2001), makes it even more clear that Nagrampa did not waive her right to object to arbitration. In *Textile Unlimited*, Textile failed to object to arbitration within the time period provided by the AAA, but eventually objected by sending a letter claiming that the arbitration provision was not part of the contract. We held that there was no valid arbitration agreement, and also made clear that "Textile only participated in the arbitration to contest the arbitration itself [and] [i]n so doing, Textile did not waive its objection to the arbitration." *Id.* at 788.

**[9]** In cases where we have found waiver, the objecting party has participated far more extensively than Nagrampa did before resorting to the courts. In *Nghiem v. NEC Electronic, Inc.,* 25 F.3d 1437, 1440 (9th Cir. 1994), we held that the plaintiff, a terminated employee, could not challenge the authority of the arbitrator because the plaintiff had "initiated the arbitration, attended the hearings with representation, presented evidence, and submitted a closing brief of fifty pages" before filing suit in state court. Similarly, in *Fortune, Alsweet & Eldridge, Inc. v. Daniel*, 724 F.2d 1355 (9th Cir. 1983) (per curiam), on which MailCoups bases its waiver argument, the plaintiff objected to arbitration after attending two hearings on the merits and after his employer had presented all of its evidence. *Id.* at 1356-57. In *Textile Unlimited,*

---

[11]In an attempt to distinguish *First Options*, Judge Kozinski presumes that the parties "consented" to arbitration. But that is a shaky premise, given that Nagrampa's position throughout was that she did not voluntarily consent to the arbitration provision.

we distinguished *Fortune* on the basis that "the [*Fortune*] plaintiff *participated* in the arbitration proceedings *on the merits* of the dispute and did not like the final results." 240 F.3d at 788 (second emphasis added). Similarly, in *Ficek v. Southern Pacific Co.*, 338 F.2d 655, 656-57 (9th Cir. 1964), we held that the claimant, an injured former employee, waived his right to contest arbitrability because he voluntarily participated in arbitration and waited until after an unfavorable decision had been handed down before challenging the authority of the arbitrators.

[10] Unlike in the arbitration cases where we have found waiver, Nagrampa forcefully objected to arbitrability at the outset of the dispute, never withdrew that objection, and did not proceed to arbitration on the merits of the contract claim. Thus, she did not waive her right to challenge the arbitrability of the dispute.

## C.

[11] It is well-established that unconscionability is a generally applicable contract defense, which may render an arbitration provision unenforceable. *See Doctor's Assocs.*, 517 U.S. at 686-87. California courts have extended the doctrine of unconscionability to embrace franchise agreements. *See Indep. Ass'n of Mailbox Ctr. Owners, Inc. v. Superior Court*, 133 Cal. App. 4th 396, 407 (2005) ("Franchise agreements are not per se unenforceable, but their provisions can be examined to see if the characteristics of unconscionability are present in part or in whole."). Because we exercise our diversity jurisdiction to entertain this contract dispute, we must apply California law to determine whether the arbitration provision in the MailCoups contract is unconscionable. *See Ferguson v. Countrywide Credit Industry, Inc.*, 298 F.3d 778, 782-83 (9th Cir. 2002); *see also Abramson v. Juniper Networks, Inc.*, 115 Cal. App. 4th 638, 651 (2004) ("Employing general contract law principles, [California] courts will refuse to enforce arbi-

tration provisions that are unconscionable or contrary to public policy." (internal quotation marks omitted)).

**[12]** California courts analyze contract provisions for both procedural and substantive unconscionability. *See Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000). In California, the "prevailing view" is that procedural unconscionability and substantive unconscionability need not both be present to the same degree: " 'Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation . . . in proportion to the greater harshness or unreasonableness of the substantive terms themselves.' " *Id.* (quoting 15 Williston on Contracts § 1763A, at 226-27 (3d ed. 1972)). "In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.*; *see also Mercuro v. Superior Court*, 96 Cal. App. 4th 167, 175 (2002) ("Given Countrywide's highly oppressive conduct in securing Mercuro's consent to its arbitration agreement, he need only make a minimal showing of the agreement's substantive unconscionability.").

Procedural unconscionability analysis focuses on " 'oppression' or 'surprise.' " *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th 846, 853 (2001). "Oppression arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice," while "[s]urprise involves the extent to which the supposedly agreed-upon terms are hidden in a prolix printed form drafted by the party seeking to enforce them." *Id.* (citing *A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 486 (1982)).

An arbitration provision is substantively unconscionable if it is " 'overly harsh' " or generates " 'one-sided' results." *Armendariz*, 24 Cal. 4th at 114 (quoting *A & M Produce*, 135 Cal. App. 3d at 486-87). "[T]he paramount consideration in assessing conscionability is mutuality." *Abramson*, 115 Cal.

App. 4th at 657. California law requires an arbitration agreement to have a "modicum of bilaterality," *see Armendariz*, 24 Cal. 4th at 117, and arbitration provisions that are "unfairly one-sided" are substantively unconscionable, *see Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064, 1071 (2003).

**[13]** The district court sidestepped the requisite procedural unconscionability analysis, erroneously finding it "nondispositive." Instead, it proceeded directly to the substantive analysis. The district court's failure to analyze the evidence of procedural unconscionability in proportion to the evidence of substantive unconscionability was error. Because California courts employ a sliding scale in analyzing whether the entire arbitration provision is unconscionable, even if the evidence of procedural unconscionability is slight, strong evidence of substantive unconscionability will tip the scale and render the arbitration provision unconscionable. *Armendariz*, 24 Cal. 4th at 114.

## 1.

The threshold inquiry in California's unconscionability analysis is "whether the arbitration agreement is adhesive." *Armendariz*, 24 Cal. 4th at 113. A contract of adhesion is defined as "a standardized contract, imposed upon the subscribing party without an opportunity to negotiate the terms." *Flores*, 93 Cal. App. 4th at 853. The California Court of Appeal has held that "[a] finding of a contract of adhesion is essentially a finding of procedural unconscionability." *Id.*; *see also Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 893 (9th Cir. 2002) ("The DRA is procedurally unconscionable because it is a contract of adhesion: a standard-form contract . . . ." ); *Aral v. Earthlink, Inc.*, 134 Cal. App. 4th 544, 557 (2005) (finding "quintessential procedural unconscionability" where "the terms of the [arbitration] agreement were presented on a 'take it or leave it' basis . . . with no opportunity to opt out"). However, the California courts have also held that though "adhesion contracts often are procedurally oppres-

sive, this is not always the case." *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1320 (2005); *see also Dean Witter Reynolds, Inc. v. Superior Court*, 211 Cal. App. 3d 758, 769 (1989) ("While we recognize significant overlap between the two concepts [adhesion and oppression], we are not prepared to hold that they are identical."). Under current California law, it is unclear whether a contract of adhesion is inherently oppressive, and therefore automatically procedurally unconscionable, or whether oppression is a separate element that must be present. However, both standards for procedural unconscionability are satisfied by a finding that the arbitration provision was presented on a take-it-or-leave-it basis and that it was oppressive due to "an inequality of bargaining power that result[ed] in no real negotiation and an absence of meaningful choice." *Flores*, 93 Cal. App. 4th at 853.

MailCoups concedes that the contract was non-negotiable and that Nagrampa's only choice was to sign it as written or to opt out. However, MailCoups argues that there was no oppression because Nagrampa had meaningful choice and bargaining power, specifically the freedom to continue to work for ValPak, her then employer, or to enter into a contract with another direct mail company. In addition, Mail-Coups posits that there was no surprise because Nagrampa is a sophisticated party who could have read and understood the terms and thus had at least constructive notice. In addition, Nagrampa signed a declaration under penalty of perjury that she had read the entire Franchise Agreement and accepted and agreed to all of its provisions, including the arbitration provision.

[14] Under California law, the critical factor in procedural unconscionability analysis is the manner in which the contract or the disputed clause was presented and negotiated:

> Procedural unconscionability focuses on the man-
> ner in which the disputed clause is presented to the

party in the weaker bargaining position. When the weaker party is presented the clause and told to "take it or leave it" without the opportunity for meaningful negotiation, oppression, and therefore procedural unconscionability, are present.

*Szetela v. Discover Bank*, 97 Cal. App. 4th 1094, 1100 (2002); *see also Martinez v. Master Prot. Corp.*, 118 Cal. App. 4th 107, 114 (2004) ("An arbitration agreement that is an essential part of a 'take it or leave it' employment condition, without more, is procedurally unconscionable."); *Mercuro*, 96 Cal. App. 4th at 174 ("Procedural unconscionability turns on adhesiveness—a set of circumstances in which the weaker or 'adhering' party is presented a contract drafted by the stronger party on a take it or leave it basis."). California courts have long recognized that franchise agreements have some characteristics of contracts of adhesion because of the "vastly superior bargaining strength" of the franchisor. *See Keating v. Superior Court*, 31 Cal. 3d 584, 593 (1982), *overruled on other grounds by Southland Corp. v. Keating*, 465 U.S. 1 (1984). As the California Court of Appeal stated in *Postal Instant Press, Inc. v. Sealy*, 43 Cal. App. 4th 1704, 1715-16 (1996):

> Although franchise agreements are commercial contracts they exhibit many of the attributes of consumer contracts. The relationship between franchisor and franchisee is characterized by a prevailing, although not universal, inequality of economic resources between the contracting parties. Franchisees typically, but not always, are small businessmen or businesswomen or people like the Sealys seeking to make the transition from being wage earners and for whom the franchise is their very first business. Franchisors typically, but not always, are large corporations. The agreements themselves tend to reflect this gross bargaining disparity. Usually

they are form contracts the franchisor prepared and offered to franchisees on a take-[it-] or leave-it basis.

. . . Franchising involves the unequal bargaining power of franchisors and franchisees and therefore carries within itself the seeds of abuse. Before the relationship is established, abuse is threatened by the franchisor's use of contracts of adhesion presented on a take-it-or-leave-it basis.

Internal quotation marks and citations omitted.

[15] Here, Nagrampa was in a substantially weaker bargaining position than MailCoups. As reported in the franchise offering circular attached to Nagrampa's complaint, Advo, MailCoups's parent company, is a large corporation which in 1997 had $208,553,000 in assets and $1,016,492,000 in revenues. Nagrampa, on the other hand, had a yearly salary of approximately $100,000 and had never owned her own business. As the district court noted, MailCoups conceded that it presented the contract on a take-it-or-leave-it basis. Nagrampa's complaint specifically alleges that she attempted to negotiate the "line-charges" cost calculation to be "lump-sum," but was rebuffed by MailCoups, who responded only that the base rate "line-charges" would be reduced by "credits."

The California Court of Appeal has rejected the notion that the availability in the marketplace of substitute employment, goods, or services *alone* can defeat a claim of procedural unconscionability. *See, e.g., Martinez*, 118 Cal. App. 4th at 114 (finding employment contract adhesive where arbitration agreement was presented as a specific "condition of employment"); *Villa Milano Homeowners Ass'n v. IL Davorge*, 84 Cal. App. 4th 819, 827 (2000) ("[I]n a given case, a contract might be adhesive even if the weaker party could reject the terms and go elsewhere."); *Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th 1519, 1533-34 (1997) (noting that even though sophisticated corporate executive "was not a person desper-

ately seeking employment," the employment contract was procedurally unconscionable because it was presented on a "take it or leave it basis"). *But see Dean Witter*, 211 Cal. App. 3d at 771 (noting that "even though a contract may be adhesive, the existence of 'meaningful' alternatives available to such contracting party in the form of other sources of supply tends to defeat any claim of unconscionability"). *Dean Witter*, on which Judge Kozinski's dissent relies, is factually distinguishable. There, the California Court of Appeal held that the combination of the plaintiff's sophistication and "a meaningful choice of available alternative sources of supply" defeated his claim of procedural unconscionability in a dispute over the assessment of fees on an individual retirement account. *Id*. at 772. The *Dean Witter* plaintiff was an investor-attorney who specialized in class action litigation involving financial institutions, and who had a great degree of experience with financial service contracts. *Id.* at 762. Whereas Nagrampa, who was a first-time franchise owner and, despite having been a sales manager in the direct marketing industry, apparently had no specialized education or training in the field. Therefore, the potential availability of other franchise opportunities alone does not defeat Nagrampa's claim of procedural unconscionability.

Moreover, the sophistication of a party, alone, cannot defeat a procedural unconscionability claim. *See Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 818-19 (1981) (finding procedural unconscionability where successful and prominent music producer Bill Graham was required by the "realities of his business as a concert promoter to sign [union] form contracts"); *A & M Produce Co.*, 135 Cal. App. 3d at 489-90 (commenting that the California Supreme Court is among the many courts that "have begun to recognize that experienced but legally unsophisticated businessmen may be unfairly surprised by unconscionable contract terms"); *Nyulassy v. Lockheed Martin Corp.*, 120 Cal. App. 4th 1267, 1283-84 (2004) (finding procedural unconscionability even where employee was represented by a lawyer in settlement negotiations).

Nagrampa argues that the element of surprise was present because the contract was adhesive and she was not informed of the existence of the arbitration provision, which appeared on page twenty-five of a thirty-page agreement. *See Wheeler v. St. Joseph Hosp.*, 63 Cal. App. 3d 345, 359-60 (1976) (citing *Smith v. Westland Life Ins. Co.*, 15 Cal. 3d 111, 122-23 (1975) ("Where the contract is one of adhesion, conspicuousness and clarity of language alone may not be enough to satisfy the requirement of awareness. Where a contractual provision would defeat the 'strong' expectation of the weaker party, it may also be necessary to call his attention to the language of the provision."). However, under California law, surprise need not be demonstrated if the court determines that the arbitration provision of an adhesive contract is oppressive. *See Armendariz*, 24 Cal. 4th at 113 ("[A] contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or unconscionable." (internal quotation marks omitted)); *Nyulassy*, 120 Cal. App. 4th at 1281 (" 'Where an adhesive contract is oppressive, surprise need not be shown.' " (quoting *Abramson*, 115 Cal. App. 4th at 656)); *Mercuro*, 96 Cal. App. 4th at 174 ("[P]rocedural unconscionability focuses on the oppressiveness of the stronger party's conduct."). The California Court of Appeal recently extended these principles to a franchise agreement, reversing a trial court's ruling that the arbitration provisions of the franchise agreements at issue were not unconscionable. *Indep. Ass'n of Mailbox Ctr. Owners*, 133 Cal. App. 4th at 410. The Court of Appeal there held that the trial court's findings regarding sophistication of the franchisees, alternative business opportunities, and ability of the franchisees to read and understand the terms of the agreement "beg the question of whether the nature of these franchise agreements and the business relationship between the parties fell within accepted criteria for adhesion contracts." *Id.*

Judge O'Scannlain's dissent mistakenly asserts that *Brookwood v. Bank of America*, 45 Cal. App. 4th 1667, 1672

(1996), stands for the proposition that MailCoups had no duty to apprise Nagrampa of the existence of the arbitration clause or the costs of arbitration. In *Brookwood*, the plaintiff did not argue that the arbitration clause was invalid because it was procedurally or substantively unconscionable, but rather that the arbitration clause should not be enforced because of unilateral mistake. *Id.* at 1673. The analysis of procedural unconscionability under California law focuses on the manner in which the contract or the disputed clause was presented and negotiated and the disparity in bargaining power, not on whether the party claiming procedural unconscionability should have known of the arbitral provision.

[16] Therefore, regardless of whether MailCoups had a duty to inform Nagrampa of the clause, it remains true that MailCoups had overwhelming bargaining power, drafted the contract, and presented it to Nagrampa on a take-it-or-leave-it basis. While we acknowledge that the evidence of procedural unconscionability appears minimal, it is sufficient to require us, under California law, to reach the second prong of the unconscionability analysis. We therefore next examine the extent of substantive unconscionability to determine, whether based on the California courts' sliding scale approach, the arbitration provision is unconscionable.

## 2.

Nagrampa argues that the arbitration provision is substantively unconscionable because it is "one-sided," contains unconscionable fee-splitting and arbitral forum provisions, and does not counteract the "repeat player effect," thus failing to ensure an impartial arbitrator.[12] We reject Nagrampa's con-

---

[12]Contrary to Judge O'Scannlain's dissent, Nagrampa did not waive her argument that the arbitration provision was unconscionably "one-sided." She alleged the one-sided nature of the arbitration provision in her complaint and argued this point in her opening brief, stating in support of her contention that California courts "have refused to uphold venue provisions

tentions that the fee-splitting provision and the "repeat player effect" render the arbitration provision substantively unconscionable. First, the fee-splitting provision is not per se substantively unconscionable under California law. *See* Cal. Civ. Proc. Code § 1284.2 (mandating default rule of arbitration that administrative costs be split equally and legal costs be borne individually). However, as discussed *infra*, to the extent the fee-splitting provision may impede Nagrampa from vindicating statutory rights, it would be unenforceable and illegal under California law as contrary to public policy.

Second, merely raising the "repeat player effect" claim, without presenting more particularized evidence demonstrating impartiality, is insufficient under California law to support an unconscionability finding. *See McManus v. CIBC World Mkts. Corp.*, 109 Cal. App. 4th 76, 94-95 (2003) (holding that an arbitration provision was not unconscionable because the plaintiff produced no specific evidence of "repeat player effect" or that the arbitrator would not be impartial, where arbitration rules allowed each party one peremptory challenge and an unlimited number of challenges for cause); *Mercuro*, 96 Cal. App. 4th at 178 ("While our Supreme Court has taken notice of the 'repeat player effect,' the court has never declared this factor renders the arbitration agreement unconscionable per se."); *cf. Sheet Metal Workers Int'l Ass'n v. Kinney Air Conditioning Co.*, 756 F.2d 742, 746 (9th Cir. 1985) (holding that to challenge an arbitral award in a collective bargaining dispute, "[t]he party alleging evident partiality must

that work to deny the weaker party any real access to a forum in which to air — or defend — her or his claims, while allowing the stronger party full access to the same forum." Moreover, MailCoups's brief argued in response that the arbitration provision does have mutuality of obligation. We may consider the claim that the fee-splitting provision is unconscionable because both parties have briefed the issue and argued the question before us, the record is adequately developed, and the cost of arbitration is undisputed. *See In re Am. West Airlines, Inc.*, 217 F.3d 1161, 1165 (9th Cir. 2000).

establish specific facts which indicate improper motives on the part of the [arbitrators]"). Nagrampa has not specifically pointed to evidence of bias on the part of the AAA or its arbitrators.

Two other provisions set forth in the arbitration clause, however, exhibit a lack of mutuality supporting a finding of substantive unconscionability. First, the contract gives Mail-Coups access to a judicial forum to obtain provisional remedies to protect its intellectual property, while it provides Nagrampa with only the arbitral forum to resolve her claims. Second, the arbitral forum is designated as Boston, Massachusetts, a location considerably more advantageous to Mail-Coups.

[17] Where the party with stronger bargaining power has restricted the weaker party to the arbitral forum, but reserved for itself the ability to seek redress in either an arbitral or judicial forum, California courts have found a lack of mutuality supporting substantive unconscionability. As the California Supreme Court held in *Armendariz*, substantive unconscionability may manifest itself in the form of "an agreement requiring arbitration only for the claims of the weaker party but a choice of forums for the claims of the stronger party." 24 Cal. 4th at 119; *see also Martinez*, 118 Cal. App. 4th at 115 (holding that an arbitration agreement requiring employees to arbitrate all claims, but reserving the right of employer to obtain injunctive or other equitable relief in a judicial forum for certain causes of action, lacks mutuality).

In *O'Hare v. Municipal Resource Consultants*, 107 Cal. App. 4th 267, 277 (2003), the California Court of Appeal was called upon to analyze the unconscionability of an arbitration clause in an employment contract that required the employee to arbitrate all claims against the employer, but expressly permitted the employer to file a lawsuit seeking injunctive and equitable relief against the employee and remained silent as to the employer's obligation to arbitrate claims. The Court of

Appeal there recognized that "unconscionability turns not only on a one-sided result, but also on an absence of justification for it." *Id*. at 273 (internal quotation marks omitted). Therefore, the Court of Appeal rejected the employer's contention that it had a legitimate business justification in the "highly confidential and proprietary nature" of its auditing and consulting work for allowing it, but not the employee, to seek injunctive relief in court. *Id*. at 277. Citing the California Supreme Court's *Armendariz* opinion, the Court of Appeal noted that to constitute a reasonable business justification, the justification must be " 'something other than the employer's desire to maximize its advantage based on the perceived superiority of the judicial forum.' " *Id*. at 277 (quoting *Armendariz*, 24 Cal. 4th at 120). Reasoning that the arbitration rules themselves permit such relief, the Court of Appeal held that there was no justification for the one-sided provision. *Id.* at 278. Because the one-sided clause permeated the entire arbitration provision, the Court of Appeal refused to enforce it on grounds of unconscionability. *Id*. at 277-78; *see also Flores*, 93 Cal. App. 4th at 854 (finding lack of mutuality of remedies where a debtor was forced to arbitrate any controversy arising out of a loan, but the lender could "proceed by judicial or non-judicial foreclosure, by self-help remedies such as setoff, and by injunctive relief to obtain appointment of a receiver"); *Stirlen*, 51 Cal. App. 4th at 1539-42 (finding an arbitration provision unconscionable where employment disputes were required to be submitted to arbitration, but breach of non-compete or confidentiality clause claims could be brought in court).

**[18]** The MailCoups arbitration provision lacks mutuality. Like the contract in *O'Hare*, it requires that Nagrampa submit to arbitration any controversy related to the franchise agreement, "or any breach thereof, including without limitation, any claim that this Agreement or any portion thereof is invalid, illegal or otherwise voidable or void," while reserving MailCoups's right to obtain any provisional remedy "including, without limitation, injunctive relief from any court of

competent jurisdiction, as may be necessary in MailCoups's sole subjective judgment to protect its Service Marks and proprietary information." This language, read plainly, means that MailCoups could go to court to obtain "any provisional remedy," even if it related to a claim for breach of contract, as long as the claim also implicated MailCoups's Service Marks or proprietary information. Moreover, it is far more likely that Nagrampa—and not MailCoups—would assert claims related to the invalidity or unenforceability of the non-negotiable contract written by MailCoups. Thus, this provision is clearly one-sided, effectively giving MailCoups the right to choose a judicial forum and eliminating such a forum for Nagrampa. California courts consistently have found such arbitration provisions unconscionable. *See Martinez*, 118 Cal. App. 4th at 115; *Mercuro*, 96 Cal. App. 4th at 176; *Stirlen*, 51 Cal. App. 4th at 1541-42.

[19] As noted, the arbitration provision itself states the purported business justification for excluding MailCoups's right to obtain provisional relief on any cause of action it might assert: "to protect its Service Marks and proprietary information." California courts routinely have rejected this justification as a legitimate basis for allowing only one party to an agreement access to the courts for provisional relief. *O'Hare*, 107 Cal. App. 4th at 277; *Mercuro*, 96 Cal. App. 4th at 177; *Stirlen*, 51 Cal. App. 4th at 1536-37. In California, "[a] party to an arbitration agreement may file in . . . court . . . an application for a provisional remedy in connection with an arbitrable controversy, but only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without provisional relief." Cal. Civ. Proc. Code § 1281.8(b). This provision ensures mutuality between the parties so that both have access to the courts to obtain preliminary injunctions, temporary restraining orders, and other forms of provisional relief. We conclude, therefore, that the clause providing for MailCoups's right to obtain provisional relief is one-sided and thus substantively unconscionable.

**[20]** Nagrampa also argues that the forum selection clause in the arbitration provision requiring her to arbitrate in Boston, Massachusetts, is unconscionable. "[F]orum selection clauses are valid and should be given effect unless enforcement of the clause would be unreasonable." *Intershop Commc'ns AG v. Superior Court*, 104 Cal. App. 4th 191, 196 (2002) (citing *Smith, Valentino & Smith, Inc. v. Superior Court*, 17 Cal. 3d 491, 495-96 (1976)). However, if the "place and manner" restrictions of a forum selection provision are "unduly oppressive," *see Bolter v. Superior Court*, 87 Cal. App. 4th 900, 909-10 (2001), or have the effect of shielding the stronger party from liability, *see Comb v. PayPal, Inc.*, 218 F. Supp. 2d 1165, 1177 (N.D. Cal. 2002), then the forum selection provision is unconscionable. To that end, a "party may attempt to make a showing that would warrant setting aside the forum-selection clause—that the agreement was affected by fraud, undue influence, or overweening bargaining power; that enforcement would be unreasonable and unjust; or that proceedings in the contractual forum will be so gravely difficult and inconvenient that the resisting party will for all practical purposes be deprived of his day in court." *Mitsubishi Motors Corp.*, 473 U.S. at 632 (citations and alterations omitted); *see also Hayes Children Leasing Co. v. NCR Corp.*, 37 Cal. App. 4th 775, 787 n.5 (1995). Similarly, "California favors contractual forum selection clauses so long as they are entered into freely and voluntarily, and their enforcement would not be unreasonable." *Am. Online, Inc. v. Superior Court*, 90 Cal. App. 4th 1, 11 (2001). The Court of Appeal discussed the rationale for this favorable treatment in *Wimsatt v. Beverly Hills Weight Loss Clinics Int'l, Inc.,* 32 Cal. App. 4th 1511, 1523 (1995), a case involving weight-loss center franchises. The Court of Appeal there stated that "[f]orum selection clauses *are* important in facilitating national and international commerce, and as a general rule should be welcomed." *Id*. However, this favorable treatment of forum selection clauses is conditioned on their free and voluntary procurement, "with the place chosen having some logical nexus to one of the parties or the dispute, and so long

as California consumers will not find their substantial legal rights significantly impaired by their enforcement." *Am. Online*, 90 Cal. App. 4th at 12. Therefore, to be enforceable, the selected jurisdiction must be " 'suitable,' 'available,' and able to 'accomplish substantial justice.' " *Id.* (citing *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 17 (1972)).

To assess the reasonableness of the "place and manner" provisions in the arbitration clause, we must take into account the "respective circumstances of the parties." *Bolter*, 87 Cal. App. 4th at 909. In *Bolter*, the Court of Appeal held that place and manner restrictions were unconscionable where small "Mom and Pop" franchisees located in California were required to travel to Utah to arbitrate their claims against an international carpet-cleaning franchisor. *Id.* The Court of Appeal found a forum selection provision unreasonable and "unduly oppressive" because the remote forum would work severe hardship upon the franchisees and would unfairly benefit the franchisor by effectively precluding the franchisees from asserting any claims against it. *Id.*; *see also Comb*, 218 F. Supp. 2d at 1177 ("Limiting venue to PayPal's backyard appears to be yet one more means by which the arbitration clause serves to shield PayPal from liability instead of providing a neutral forum in which to arbitrate disputes."); *Armendariz*, 24 Cal. 4th at 118 (holding that structuring an arbitration provision to effectively preclude the other party from pursuing its claims would be unconscionable, because "[a]rbitration was not intended for this purpose"). Because the unconscionable time and place requirements in *Bolter* had not tainted the entire agreement, the Court of Appeal chose to sever them. 87 Cal. App. 4th at 911.

We respectfully disagree with the view expressed in Judge O'Scannlain's dissent that the holding in *Bolter* rested on the unfairness and lack of notice engendered by the franchisor's insertion of a clause setting the arbitral forum to be out-of-state into a subsequent franchise agreement. The *Bolter* court repeatedly emphasized that its holding rested on the financial

hardship the forum selection provision would impose on the franchisees, effectively precluding them from litigating their claims, and that the forum selection provision had "no justification other than as a means of maximizing an advantage over the petitioners." 87 Cal. App. 4th. at 910. Moreover, Judge O'Scannlain's dissent mistakenly relies on *Lu v. Dryclean-U.S.A. of California, Inc.*, 11 Cal. App. 4th 1490, 1493 (1992), to support its position that California courts uphold forum selection provisions where the extenuating circumstances of *Bolter* are not present. The plaintiffs in *Lu* did not argue that the arbitration provision was unconscionable, but merely stated that the forum selection provision was unreasonable. *Id*. Unlike Nagrampa and the plaintiffs in *Bolter*, the *Lu* plaintiffs did not argue or present evidence that the out-of-state forum would impose a financial hardship or preclude them from litigating their claims, but rather argued that the clause was unenforceable because they had insufficient connection to the selected forum and because two of the defendants had not signed the agreement containing the forum selection clause. *Id.* The court construed the plaintiffs' first argument as being, in essence, that the forum was inconvenient and then proceeded simply to state that "[m]ere inconvenience or additional expense is not the test of unreasonableness." *Id.* (internal quotation marks omitted).

Here, the district court erred by misapplying California law on the substantive unconscionability of the forum selection clause. Although it had not actually analyzed procedural unconscionability, it found that the absence of restrictions which could be considered "unfair, harsh, or overly one-sided" distinguished Nagrampa's case from *Bolter*. It then concluded that because Nagrampa had signed the franchise agreement containing the arbitration provision, it was "valid, irrevocable and enforceable."

Moreover, the district court did not consider Nagrampa's allegations, as stated in the fourth, fifth, and sixth causes of action in her complaint, that MailCoups's imposition of the

arbitration provision violated three California statutes — (1) the California Franchise Investment Law ("FIL"), Cal. Corp. Code §§ 31000-31516; (2) the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17208; and (3) the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750-1785 — which establish nonwaivable statutory rights. *See Indep. Ass'n of Mailbox Ctr. Owners*, 133 Cal. App. 4th at 416 (holding that claims under the FIL and the UCL "affect the public interest and appear to fall . . . within the rules of *Armendariz*"); *Gutierrez v. Autowest, Inc.*, 114 Cal. App. 4th 77, 99-100 (2003) (holding that an arbitration provision may not impede statutory rights under the CLRA). Those allegations bear on both the questions of (1) who has the burden of proving the unfairness or unreasonableness of the forum selection clause; and (2) the enforceability of the clause itself. *Wimsatt*, 32 Cal. App. 4th at 1522 (shifting burden of proof to party seeking to enforce a forum selection clause "to show that litigation in the contract forum will not diminish in any way the substantive rights afforded California franchisees under California law"); *Am. Online*, 90 Cal. App. 4th at 10-11 (finding "identical policy considerations which command shifting the burden of proof here to [the franchisor], the party seeking enforcement of the forum selection clause," because the statute at issue (CLRA) and the statute in *Wimsatt* (FIL) contained the same provision prohibiting waivers by consumers of any statutorily granted remedies). Thus, under California law, the burden of proving not only the reasonableness and fairness of the arbitration provision, but also that the CLRA's anti-waiver provision is not violated, rests with MailCoups. *Wimsatt*, 32 Cal. App. 4th at 1522. MailCoups has not met this burden.

**[21]** The parties' bargaining positions were unequal, resulting in an oppressive contract of adhesion containing a forum selection clause that places venue in Boston, Massachusetts, only a few miles away from MailCoups headquarters in Avon, but three thousand miles away from Nagrampa's home. As in *Bolter*, the MailCoups contract would require a one-woman

franchisee who operates from her home to fly across the country to arbitrate a contract signed and performed in California. Nagrampa would incur additional traveling and living expenses and "increased costs associated in having counsel familiar with [Massachusetts] law." *Bolter*, 87 Cal. App. 4th at 909. Nagrampa lost money operating her MailCoups franchise and faces financial hardship. She may not be able to maintain her claim to recover any of her losses if forced to do so in Massachusetts. The forum selection provision has "no justification other than as a means of maximizing an advantage over [franchisees]." *Id.* at 910. As in *Bolter*, "[a]rguably, [MailCoups] understood those terms would effectively preclude its franchisees from ever raising claims against it, knowing the increased costs and burden on their small businesses would be prohibitive." *Id.* Indeed, that was the effect of requiring arbitration to proceed in Boston, a location so prohibitively costly to Nagrampa that she was precluded from participating in the proceeding.[13]

Moreover, Nagrampa did not have reason to expect that the arbitration would take place in Boston; nor, apparently, did MailCoups. We have found that, where the franchise-offering circular contained language suggesting that the out-of-state forum selection and choice of law clauses may not be enforceable under California law, there was "no reasonable expecta-

---

[13]Judge O'Scannlain's dissent asserts that Nagrampa had more than enough money to pay the $6,500 in arbitration fees and to litigate in an out-of-state forum, on the false assumption that she had an average of $16,000 in her bank account during the relevant time period. However, the dissent misconstrues the record, which contains three bank statements for the three months preceding September 2002 for the account held jointly by Nagrampa and her husband. The average monthly deposits during this period were $41,151.17 and the average monthly withdrawals and debits were $45,031.30. The ending balance on August 14, 2002 was $9,991.90. Assuming that, in the following month, Nagrampa and her husband's deposits and withdrawals were close to the average, then payment of the initial $6,500 filing fee alone, without consideration of the additional expenses required to litigate in an out-of-state forum, would result in a bank account overdrawn by $388.23.

tion that [the franchisee] had agreed to a forum other than California." *Laxmi Invs., LLC v. Golf USA*, 193 F.3d 1095, 1097 (9th Cir. 1999) (internal quotation marks omitted). We held in *Laxmi* that, regardless of whether the California statute limiting venue to California for franchise disputes, Cal. Bus. & Prof. Code § 20040.5, was preempted by the FAA, the franchisor could not include such misleading language in the offering circular and then later take the position that California law will not control. "A contrary approach would unnecessarily undercut the California public policy which requires honest disclosures to franchisees." *Laxmi*, 193 F.3d at 1098; *see also Bradley v. Harris Research Inc.*, 275 F.3d 884, 891 (9th Cir. 2001) (holding that section 20040.5 is preempted by the FAA, but distinguishing *Laxmi* because, in *Laxmi*, "there was no evidence that the franchisor 'ever indicated that it would insist upon an out-of-state forum despite the contravening California law' referred to in the [circular], and the franchisee had no reason to expect that it had agreed to an out-of-state forum," indicating that "there was no 'meeting of the minds on the forum selection provision' " (quoting *Laxmi*, 193 F.3d at 1097)).

Nagrampa and MailCoups entered into the franchise agreement in 1998, when section 20040.5 was still considered good law and out-of-state forum selection provisions in franchise agreements were not enforceable under California law. To this end, the MailCoups offering circular,[14] like the offering circular in *Laxmi*, 193 F.3d at 1096, contained language suggesting that the forum selection, choice of law, and termination or nonrenewal clauses may be unenforceable under California law. Under the FIL, the franchisor must disclose certain information about the subject franchise and franchisor through a Uniform Franchise Offering Circular and a registered prospectus. Cal. Corp. Code § 31119(a). The FIL pro-

---

[14]We may properly consider the franchise offering circular, which was attached as an exhibit to Nagrampa's complaint and was admitted before the district court.

hibits franchisors from making material misrepresentations or omissions in the offer and sale of any franchise. *Id.* at §§ 31200-31203. Under California law, when fraud or illegality is alleged, the parol evidence rule does not apply, and evidence of pre-contract representations which vary or contradict the terms of an integrated contract are admissible. *See* Cal. Civ. Proc. Code § 1856(g). The theory supporting the exception is that "[s]uch evidence does not contradict the terms of an effective integration since it shows that the purported instrument has no legal effect." *See Cont'l Airlines, Inc. v. McDonnell Douglas Corp.*, 216 Cal. App. 3d 388, 424-25 (1989) (quoting 2 Witkin, California Evidence § 997 at 944 (3d ed. 1986)). Because Nagrampa argues that the forum selection provision did not fall within her reasonable expectations, we examine the representations in the franchise offering circular to discern her reasonable expectations. The salient point is that, just as in *Laxmi*, "there is no evidence that [MailCoups] ever indicated that it would insist upon an out-of-state forum despite the contravening California law" in place at the time the contract was executed. *Laxmi*, 193 F.3d at 1097.

The clauses in Section H of the MailCoups offering circular, which Nagrampa filed as an exhibit to her complaint, are virtually identical to those at issue in *Laxmi*:

> (4)   Item 17 of this disclosure document is modified to include the following paragraph under the Summary column of part (u) of both charts:
>
> > The franchise agreement requires binding arbitration. The arbitration will occur at the offices of the American Arbitration Association nearest our home office. This provision may not be enforceable under California law.
>
> (5) Item 17 of this disclosure document is modified to include the following paragraphs under the Summary column of parts (v) and (w) of both charts:

> California Business Professional Code Sections 20000 through 20043 provide rights to you concerning termination or nonrenewal of a franchise. If the franchise agreement contains a provision that is inconsistent with the law, the law will control.

> The franchise agreement requires application of the laws of the State of Massachusetts. This provision may not be enforceable under California law.

[22] Like the *Laxmi* court, we conclude that the misleading language of the MailCoups offering circular provided inadequate notice to Nagrampa that the forum selection clause was valid. Nagrampa thus had no reason to expect that arbitration would take place in Boston. To the contrary, she had every reason to expect that the arbitration, if any, would take place in California, in accordance with California law, as expressly raised in the circular. That MailCoups initially filed for Los Angeles, California, as the arbitration venue only reinforces the conclusion that both parties reasonably expected arbitration to take place in California.

[23] Moreover, where a party has not received actual notice of a forum selection clause, the California Court of Appeal has refused to enforce it. *See Intershop Commc'ns AG*, 104 Cal. App. 4th at 201-02 ("A forum selection clause within an adhesion contract will be enforced 'as long as the clause provided adequate notice to the [party] that he was agreeing to the jurisdiction cited in the contract.' " (alteration in original) (quoting *Hunt v. Superior Court*, 81 Cal. App. 4th 901, 908 (2000))); *Carnival Cruise Lines, Inc. v. Superior Court*, 234 Cal. App. 3d 1019, 1026-27 (1991) (citing Cal. Civ. Code §§ 1550, 1565, 1580) ("[T]he forum selection clause is unenforceable . . . if the court determines that [the] plaintiff did not have sufficient notice of [it]. . . . Absent such notice, the req-

uisite mutual consent to that contractual term is lacking and no valid contract with respect to such clause thus exists."). The misleading language of the offering circular, as well as MailCoups's institution of proceedings in California, lead us to conclude that Nagrampa had no reasonable expectation that arbitration would take place in Boston.

Second, California courts refuse to enforce arbitration provisions on public policy grounds if they impede the enforcement of unwaivable statutory rights. *See Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal. 4th 495, 506-07 (2005) (stating that employees subject to mandatory arbitration agreements must be ensured certain minimum standards of fairness to "vindicate their public rights in an arbitral forum" (internal quotation marks omitted)). Under California law, a right or cause of action created for a public purpose cannot, by private agreement, be waived, contravened, burdened, or subjected to procedural shortcomings that would preclude its vindication. *See Armendariz*, 24 Cal. 4th at 100 (explaining that this rule derives from California Civil Code section 3513, which prohibits the contractual waiver of legal rights established for a public purpose, and section 1668, which makes unlawful those contracts that would exempt a party from violations of law); *see also Little*, 29 Cal. 4th at 1076-77; *Abramson*, 115 Cal. App. 4th at 652. Following this principle, California courts have stricken arbitration provisions that would prevent the enforcement and vindication of public rights by imposing unreasonable fees on a party, *Armendariz*, 24 Cal. 4th at 110-11, or by requiring arbitration in a distant and inconvenient forum, *Am. Online*, 90 Cal. App. 4th at 12 ("California courts will refuse to defer to the selected forum if to do so would substantially diminish the rights of California residents in a way that violates our state's public policy."). Because the forum selection provision in this case could "force [Nagrampa] to forgo unwaivable public rights," *Little*, 29 Cal. 4th at 1079, by imposing unreasonable costs to arbitrate her claims in Massachusetts, it may also be

unenforceable as contrary to California public policy, *see Am. Online,* 90 Cal. App. 4th at 12-15.

To the extent that the fee-splitting clause in the arbitration provision impedes the exercise of unwaivable statutory rights under California law, it may also be unenforceable. The arbitration agreement provides:

> The costs of arbitration shall be borne equally by MailCoups and Franchisee. Each party shall be responsible for the fees and expenses of its respective attorneys and experts.

The California Court of Appeal has previously found that the vindication of statutory rights under the FIL, the UCL, and the CLRA deserves protection from insurmountable and unreasonable arbitration fees. *See Indep. Ass'n of Mailbox Ctr. Owners*, 133 Cal. App. 4th at 417 (remanding to trial court to determine whether fee structure in arbitration agreement would impede rights under FIL, UCL, and other statutes); *Gutierrez*, 114 Cal. App. 4th at 98-99 (holding that imposition of up-front arbitration fees is unconscionable because it would prevent consumers from enforcing rights under CLRA). To qualify for fee protection, Nagrampa's claims "must be carefully tethered to statutory or constitutional provisions." *Boghos,* 36 Cal. 4th at 508. Nagrampa's statutory claims must affect the public interest such that she is invoking "substantive and procedural rights not just for the benefit of individuals but also for public purposes." *Id.* at 506. Therefore, at a minimum, if Nagrampa were to make a prima facie showing that her statutory claims affect the public interest, she would be entitled to an advance fee allocation ruling to enable vindication of her statutory rights on that ground.

## D.

**[24]** We hold that the arbitration provision in the Mail-Coups's franchise agreement is both procedurally and sub-

stantively unconscionable. Applying California's sliding scale test for unconscionability, even though the evidence of procedural unconscionability is slight, the evidence of substantive unconscionability is strong enough to tip the scale and render the arbitration provision unconscionable.

MailCoups's reservation to itself of the right to seek any provisional remedy it decides it needs from any court of competent jurisdiction is substantively unconscionable because it lacks mutuality. Further, the forum selection clause is substantively unconscionable because (1) as part of a contract of adhesion, it was not entered into freely and voluntarily; (2) Nagrampa was provided inadequate notice in the offering circular because the circular contained misleading language creating the reasonable expectation that it would not be enforced; and (3) considering the respective circumstances of the parties, the "place and manner" requirements are unduly oppressive and harsh upon Nagrampa, who had no bargaining power. In addition, the forum selection clause, as well as the fee-splitting clause, may contravene California public policy to the extent that they impede the exercise of Nagrampa's unwaivable statutory rights. Because the district court did not reach the public policy issue, however, we decline to reach it now.

**[25]** The only portion of the arbitration provision that may yet be viable is the fee-splitting clause. However, we must conclude that the fee-splitting clause does not save the arbitration provision from a finding of invalidity. The MailCoups arbitration provision is so permeated by substantive unconscionability that it cannot be cured by severance or any other action short of rewriting the contract. *See Armendariz*, 24 Cal. 4th at 124-25; Legis. Comm. cmt*.,* Cal. Civ. Code § 1670.5 (West 1985). The arbitration provision at issue has "multiple defects [that] indicate a systematic effort to impose arbitration on [Nagrampa], not simply as an alternative to litigation, but as an inferior forum that works to [MailCoups's] advantage." *Armendariz*, 24 Cal. 4th at 124. There simply is "no single

provision [we] can strike or restrict in order to remove the unconscionable taint from the agreement." *Id.* at 124-25. California Civil Code section 1670.5 does not grant us the discretion to reform or modify the arbitration provision through augmentation and neither does the FAA. Because we are unable to save the arbitration agreement by severance or restriction, we hold that the entire arbitration provision is invalid and unenforceable. Therefore, FAA § 4 did not require the district court to direct the parties to proceed to arbitration. Proceedings should continue in the district court. We do not reach the question of the validity of any provision in the franchise agreement other than "Article 35: Dispute Resolution," the arbitration provision.

## III

The district court properly undertook to decide whether the arbitration provision in the MailCoups franchise agreement is valid and enforceable within the meaning of FAA § 2, and properly relied upon California law in its analysis. However, the district court erred by failing to analyze whether there is evidence of procedural unconscionability and to weigh both procedural and substantive unconscionability on a sliding scale as dictated by the California Supreme Court in *Armendariz.* Thus, we conclude that the district court erroneously found that the arbitration provision was valid and enforceable and improperly dismissed the action. We therefore REVERSE and REMAND for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

**Volume 2 of 2**

CLIFTON, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the district court properly undertook in this case to decide whether the arbitration provision in the MailCoups franchise agreement is valid and enforceable within the meaning of the Federal Arbitration Act. I also agree that Nagrampa did not waive her right to object to the arbitrability of the dispute. I thus concur in sections II-A and II-B of the majority opinion by Judge Wardlaw.

I part company with the majority as to its conclusion that the arbitration provision was unconscionable under California law. I believe that the district court was correct in concluding that the arbitration provision was valid and enforceable. I concur in the relevant portions of the dissents by Judge O'Scannlain (sections II-D and III) and by Judge Kozinski (section II). Like them, I would affirm the judgment of the district court.

O'SCANNLAIN, Circuit Judge, with whom Judges KOZINSKI and TALLMAN join, and with whom Judge CLIFTON joins as to Parts II-D and III, dissenting:

I respectfully dissent because I believe that the Court ignores clear Supreme Court precedent in choosing to entertain Nagrampa's challenge to the validity of the entire franchise contract. In addition, I cannot agree with much of the majority's analysis regarding the substantive unconscionability of the arbitration clause.

## I

Connie A. Nagrampa, a resident of Contra Costa County (in the San Francisco Bay area), California, earned over

$100,000 per year as a Sales Manager for ValPak Direct Marketing Systems, a position she held from 1992-1998.

In the summer of 1998, a MailCoups, Inc.,[1] representative approached Nagrampa and encouraged her to become a Mail-Coups franchisee.[2] In June of that year, MailCoups sent Nagrampa a notebook containing a franchise offering circular and franchise agreement. After Nagrampa prepared a spread-sheet showing her expected costs and profits, her contact at MailCoups confirmed that her calculated 41 percent profit figure was "about right."

On August 24, 1998, Nagrampa signed the thirty-page franchise agreement, declaring under penalty of perjury that she had read and agreed to each of its provisions. Article 35 of the agreement, entitled "Dispute Resolution," reads:

> *Arbitration.* Any controversy or claim arising out of or relating to this Agreement, or any breach thereof, including, without limitation, any claim that this Agreement or any portion thereof is invalid, illegal or otherwise voidable or void, shall be submitted to arbitration before and in accordance with the rules of the American Arbitration Association or successor organization. Provided, however, that this clause shall not be construed to limit MailCoups' right to obtain any provisional remedy, including, without limitation, injunctive relief from any court of competent jurisdiction, as may be necessary in MailCoups' sole subjective judgment, to protect its Service Marks and proprietary information. The decision of the arbitrator shall be binding upon the parties and judgment upon the award may be entered in any

---

[1]MailCoups is a corporation incorporated under the laws of Delaware and has its principal place of business in Massachusetts.

[2]A MailCoups franchisee recruits businesses to advertise through coupons mailed to residences in her service area.

> court having jurisdiction thereof. The situs of the arbitration proceedings shall be the regional office of the American Arbitration Association which is located in Boston, Massachusetts. The costs of arbitration shall be borne equally by MailCoups and Franchisee. Each party shall be responsible for the fees and expenses of its respective attorneys and experts.

The term of the franchise agreement was ten years.

Although Nagrampa worked over sixty hours a week, her MailCoups franchise was a failure. Despite her efforts, she claims that she never received any personal income, instead incurring substantial debt to cover her living expenses. Owing in part to her precarious financial situation, Nagrampa sent MailCoups a September 22, 2000, letter terminating her franchise agreement and stating her intent to pay certain "amounts due" under the agreement.

MailCoups never received payment for the full amount it claimed was due under the franchise agreement, and in December 2001, it filed a Demand for Arbitration, seeking payment of over $80,000 owed by Nagrampa. MailCoups requested the arbitration be held in Los Angeles, the location of its regional office. Nagrampa initially participated in the prehearing procedures, but she objected to holding the arbitration in Los Angeles, requesting instead that it take place in Contra Costa County. When the parties were unable to agree on a location, the American Arbitration Association ("AAA") arbitrator determined that—per the terms of the franchise agreement—the arbitration would be held in Boston.

When she received a schedule of fees for the arbitration, Nagrampa requested a waiver for all fees from the AAA. However, she failed to complete the necessary forms to receive the waiver, despite being advised of the requirements. The waiver became moot when Nagrampa ceased her partici-

pation in the arbitration following the designation of Boston as the venue. The arbitration proceeded without her and resulted in an award against her of over $160,000.

In the meantime, Nagrampa filed suit against MailCoups and the AAA in California state court, alleging that Mail-Coups was liable for common-law misrepresentation and fraud, as well as for violating the California Consumer Legal Remedies Act and California's franchise and unfair competition laws. Nagrampa sought monetary damages from Mail-Coups and an injunction preventing the company from enforcing the arbitration clause against her.

Invoking the parties' diversity of citizenship, MailCoups removed the case to federal court and then moved to compel arbitration and to stay or dismiss the court proceedings. In opposition, Nagrampa argued that the arbitration clause was unconscionable and thus unenforceable. She argued that the arbitration clause was procedurally unconscionable because her "franchise agreement [was] a contract of adhesion. It was presented to her on a take-it-or-leave-it basis. She was not allowed to negotiate any of its terms." She then gave three grounds for the arbitration clause's substantive unconscionability: 1) a venue of Boston was unfair, 2) the arbitrator was not neutral, and 3) MailCoups did not disclose the costs of arbitration.

The district court concluded that the agreement was valid and granted MailCoups' motion to dismiss.[3] Nagrampa timely

---

[3]The district court denied MailCoups' motion to compel arbitration because § 4 of the Federal Arbitration Act ("FAA") requires that an arbitration hearing take place in the district in which the motion to compel was filed. *See* 9 U.S.C. § 4 ("The hearing and proceedings . . . shall be within the district in which the petition for an order directing such arbitration is filed."). Relying upon the franchise agreement's designation of Boston as the arbitration forum, the district court concluded that the District of Massachusetts was the proper venue for MailCoups to obtain an order compelling arbitration. MailCoups did not file a cross-appeal.

appealed, and a three-judge panel affirmed the district court by written opinion on March 21, 2005. Following Nagrampa's petition for rehearing, a majority of the Court voted to rehear the case en banc.

## II

California law places the burden of proving unconscionability on the party challenging the validity of the arbitration clause.[4] *See Szetela v. Discover Bank*, 97 Cal. App. 4th 1094, 1099 (Ct. App. 2002). "[U]nconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 690 (Cal. 2000) (internal quotation marks omitted). Although both elements must be present for a court to exercise its discretion to invalidate an agreement as unconscionable, they need not be present in the same degree. *Id.* Because procedural and substantive unconscionability exist on a sliding scale, "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.*

Nagrampa claims that the franchise agreement's arbitration clause was both procedurally and substantively unconscionable. At the district court, Nagrampa insisted that the "franchise agreement [was] a contract of adhesion" and therefore procedurally unconscionable. I remain convinced that this Court lacks jurisdiction to consider that argument.

---

[4]I agree with the majority that the parties have waived the franchise agreement's choice of law provision, which specified Massachusetts law as controlling, by arguing their respective causes on the basis of California law both in the district court and here. *See Panno v. Russo*, 186 P.2d 452, 454 (Cal. Ct. App. 1947) ("[A] party to a contract may by conduct or representations waive the performance of a condition thereof or be held estopped by such conduct or representations to deny that he has waived such performance.").

A

The Supreme Court has identified two types of challenges to the validity of an arbitration agreement. *Buckeye Check Cashing, Inc. v. Cardegna*, 126 S. Ct. 1204, 1208 (2006). "One type challenges specifically the validity of the agreement to arbitrate." *Id.* "The other challenges the contract as a whole, either on a ground that directly affects the entire contract (*e.g.*, the agreement was fraudulently induced) or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Id.* Section 4 of the FAA requires that these two types of challenges be treated differently. *See id.*

*Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 402 (1967), recognized as much when it considered the question of "whether a claim of fraud in the inducement of the entire contract is to be resolved by the federal court, or whether the matter is to be referred to the arbitrators." Under § 4 of the FAA, 9 U.S.C. § 4, a federal court must order arbitration "once it is satisfied that 'the making of the agreement for arbitration or the failure to comply [with the arbitration agreement] is not in issue.' " *Id.* at 403 (quoting 9 U.S.C. § 4) (alteration in original). "Accordingly, if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it." *Id.* at 403-04. However, the court may not "consider claims of fraud in the inducement of the contract generally." *Id.* at 404; *see id.* ("[A] federal court may consider only issues relating to the making and performance of the agreement to arbitrate.").

*Buckeye* reaffirmed this approach. 126 S. Ct. at 1208-09. Drawing from *Prima Paint*, *Buckeye* states that "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Id.* at 1209. Therefore, "a challenge to the validity of the contract as a whole, and not *specifically* to the arbitra-

tion clause, must go to the arbitrator." *Id.* at 1210 (emphasis added). Although *Buckeye* concerned an attempt to invalidate an entire contract based on "the illegality of one of the contract's provisions," the Supreme Court equated this type of challenge with one brought "on a ground that directly affects the entire agreement." *See id.* at 1208.

## B

Nagrampa clearly challenged the validity of the contract as a whole. Even her more directed complaint against the arbitration clause incorporates a contract-of-adhesion claim that "directly affects the entire agreement." *See id.* Considering the Supreme Court's classification of this type of challenge as one that must be considered by an arbitrator, our duty could not be clearer. When an agreement to arbitrate is challenged, we must look to see whether the challenge goes to the validity of the contract as a whole or whether it goes "specifically" to the arbitration clause. *Id.* Whether difficulties result from our lack of jurisdiction should have no bearing on our decision on the issue; we "are bound to apply rules enacted by Congress with respect to matters—here, a contract involving commerce —over which it has legislative power." *Prima Paint*, 388 U.S. at 406. The FAA was specifically enacted with respect to just such a matter. *See id.* at 405.

Contrary to the majority's view, Nagrampa does not *specifically and exclusively* target the arbitration clause as a contract of adhesion. Nor could she, considering her argument on appeal that the clause was "hidden" in the contract and never "pointed out or explained to her." Indeed, she argues that the arbitration agreement is procedurally unconscionable because the *entire* contract was a contract of adhesion, offered on a "take-it-or-leave-it" basis. A clear statement of her position can be found in the Plaintiff's Opposition to Motion to Compel [Arbitration], filed with the district court: "Ms. Nagrampa's franchise agreement is a contract of adhesion." It is the validity of the entire *franchise agreement* that Nagrampa chal-

lenges. The opposition brief continues: "Ms. Nagrampa's entire contract was obtained by fraud and therefore should be revoked."

Refusing to acknowledge these statements made by Nagrampa to the district court,[5] the majority proclaims: "[N]owhere in her complaint does she seek rescission or invalidation of the entire contract based on it being a contract of adhesion." Majority Opinion at 18915. Yet not only does Nagrampa's argument in her opposition brief reveal her request to revoke the entire agreement, but her complaint itself offers no reason to believe that she wished the court only to sever the arbitration clause. In her fourth, fifth, and sixth causes of action, Nagrampa asked for "such other and further relief as the court may deem proper." The majority blindly ignores Nagrampa's later statements that shed light on what "further relief" she desired.

Adequate review of the district court requires us to evaluate all relevant documents filed with that court, including those that led the district court to state: "Plaintiff characterizes the franchise agreement as a contract of adhesion, and argues that it is therefore procedurally unconscionable *per se*." Because the full record makes evident that Nagrampa's claims of pro-

---

[5]The majority states that under *Buckeye* and *Prima Paint* a court must consider only the complaint to discern the "nature of the relief that may be afforded." Majority Opinion at 18915 n.6. The majority then concedes that it is the "*type of claim* asserted in the complaint" that matters. *Id.* (emphasis added). Next the majority decides that certain parts of the complaint should be *ignored*. In particular, the majority discounts the portion of the complaint requesting "such other and further relief as the court may deem proper" as "*mere boilerplate*," *id.* (emphasis added), although Nagrampa later explained what other relief she sought.

The majority's flawed analysis both contorts the claims presented in the complaint, and disrespects Nagrampa's abilities. I believe Nagrampa was capable of choosing substance over form in her complaint, and capable of reading her "attorney's arguments" before accepting their inclusion in her submissions to the district court.

cedural unconscionability were not aimed specifically at the arbitration provision, *Prima Paint* and *Buckeye* require us to leave this argument to be decided by an arbitrator.

Turning away from a comprehensive analysis of the documents filed by Nagrampa, the majority seeks to distill the "crux of the complaint." Majority Opinion at 18892. This narrowing technique leads the majority to conclude that Nagrampa's cognizable claims "specifically and exclusively challenge the validity of the arbitration provision." *Id.* at 18893. Having reached this conclusion, the majority apparently allows Nagrampa to attack such clause on *any* ground, "even if substantive state law requires an examination of the making of the entire contract." *Id.* at 18904. Such interpretation would allow us to reach grounds that the *Buckeye* Court recognized to "directly affect[ ] the entire agreement," *Buckeye*, 126 S. Ct. at 1208, thus making a mockery of the FAA and its "national policy" in favor of arbitration. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627 (1985).

The majority adopts certain language from *Buckeye*, while ignoring more relevant passages. *Buckeye* notes that two different types of challenges fall within the broader category that must be submitted to an arbitrator. 126 S. Ct. at 1208. One of those types is a challenge on a ground that "renders the whole contract invalid," *id.*, but that is not the type of challenge Nagrampa brings. Hers is more correctly characterized as a challenge "on a ground that affects the entire agreement." *See id.* Nothing in *Buckeye* suggests that a party can base an attack on grounds that directly affect the entire contract, so long as the "crux of the complaint" is not a challenge to the contract as a whole.

The majority insists that none of Nagrampa's claims would invalidate the entire contract, if proved. Majority Opinion at 18904. *Buckeye* does not support this approach; it identifies the first type of challenge that must be submitted to an arbitrator, not based on whether the ground for attack invalidates the

entire contract, but on whether the ground "directly affects" it. *See Buckeye*, 126 S. Ct. at 1208. The Supreme Court *could* have stated that challenges to an arbitration clause "on a ground that [invalidates] the entire contract" must be decided by an arbitrator, but it did not do so. *See id.* Thus, where *Buckeye* draws a distinction between the two types of challenges that must be submitted to an arbitrator, the majority's approach collapses the two into one. In my view, had the Supreme Court meant to adopt such an approach, it simply would have done so.

## C

Our sister circuits do not follow the majority's approach. Instead, the Second, Fifth, Sixth, Eighth, and Eleventh Circuits[6] all agree that any argument of unconscionability must be directed to the arbitration clause *alone* to be considered by a court rather than the arbitrator.

Speaking directly to the issue, the Eleventh Circuit held that "the FAA does not permit a federal court to consider claims alleging the contract as a whole was adhesive." *Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 877 (11th Cir. 2005). Specifically, " '[i]f . . . [the party's] claims of adhesion, unconscionability, . . . and lack of mutuality of obligation pertain to the contract as a whole, and not to the arbitration provision alone, then these issues should be resolved in arbitration.' " *Id.* (quoting *Benoay v. Prudential-Bache, Secs., Inc.*, 805 F.2d 1437, 1441 (11th Cir. 1986)) (alterations in original). The Second Circuit[7] reached a similar

---

[6]Neither *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1 (1st Cir. 1999), nor *Alexander v. Anthony International, L.P.*, 341 F.3d 256 (3d Cir. 2003), cited (much less discussed) *Prima Paint* or analyzed the jurisdictional issue presented in this case. As such, they offer little insight into the approaches taken by our sister circuits on this issue.

[7]The majority cites *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245 (2d Cir. 1991), but that case did not discuss the issue of jurisdiction. As such, like *Alexander* and *Rosenberg*, it provides little support for the majority's position, particularly in light of the Second Circuit's later *JLM* decision.

result in *JLM Industries, Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 170 (2d Cir. 2004), when it refused to consider a contract-of-adhesion claim that did not apply to "the arbitration clause alone."

Similarly, the Sixth Circuit[8] in *Burden v. Check Into Cash of Kentucky, LLC*, 267 F.3d 483, 493 (6th Cir. 2001), specifically rejected plaintiffs' claims that arbitration agreements were unenforceable because contained in contracts of adhesion; such claims could not be considered because they did not "attack the arbitration clause, *separate from* the underlying loan agreements." *Id.* at 492 n.3 (emphasis added). While the Sixth Circuit returned several claims to the district court because they specifically concerned the arbitration clause, the contract-of-adhesion claim was not one of them. *Id.* at 492. *Burden*'s holding on the issue we face is unambiguous: "When determining the enforceability of an arbitration agreement, a court 'can investigate the existence of such grounds as exist at law or in equity for the revocation of any contract . . . . However, the grounds for revocation must relate specifically to the arbitration clause and not just to the contract as a whole.' " *Id.* at 492—93 (quoting *Hooters of Am. v. Phillips*, 173 F.3d 933, 938 (4th Cir. 1999), which cites 9 U.S.C. § 2; *Prima Paint*, 388 U.S. at 402-04 (alteration in original)).

Similarly, the Fifth Circuit has stated that "unless a defense relates specifically to the arbitration agreement, it must be submitted to the arbitrator as part of the underlying dispute." *Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 472 (5th Cir. 2002).[9] In the same vein, *Rojas v. TK Communications, Inc.*,

---

[8]*Stout v. J.D. Byrider*, 228 F.3d 709 (6th Cir. 2000), is not relevant to the analysis. The decision does not discuss the jurisdictional issue or even cite to *Prima Paint*. Moreover, the decision involved free-standing arbitration agreements and is therefore distinguishable from the present case.

[9]The majority cites *Washington Mutual Finance Group, LLC v. Bailey*, 364 F.3d 260, 266 (5th Cir. 2004), but like the Sixth Circuit's decision in *Stout*, the decision concerned an "Alternative Dispute Resolution Agreement" which was executed separately from other contract provisions, unlike here.

87 F.3d 745 (5th Cir. 1996), rejected an attack on an arbitration clause as an unconscionable contract of adhesion because it was "an attack on the formation of the contract generally, not an attack on the arbitration clause itself." *Id.* at 749. For the *Rojas* Court, one indication that the plaintiff's attack was not limited to the arbitration provision was her argument that the agreement was based on "inequality of bargaining power." *Id.* at 749 n.3. Tellingly, Nagrampa's contract-of-adhesion claim is based, in part, on just such an argument.

Finally, the Eighth Circuit has held that a plaintiff's claims must be referred to arbitration when the "arguments of unconscionability 'cannot fairly be limited to the making of the arbitration clause.'" *Madol v. Dan Nelson Auto. Group*, 372 F.3d 997, 1000 (8th Cir. 2004) (quoting *Houlihan v. Offerman & Co., Inc.*, 31 F.3d 692, 695 (8th Cir. 1994)). In *Houlihan*, the Eighth Circuit rejected an attempt to target an arbitration clause on grounds that applied to the entire contract, reasoning that the plaintiff had not presented "any rationale for concluding that the alleged misrepresentations *relate[d] only* to the arbitration clause." 31 F.3d at 695 (emphasis added).

The majority chooses to focus only on whether a plaintiff's claim would invalidate the entire contract, ignoring *Buckeye*'s plain statement regarding challenges brought on "a ground that directly affects the entire agreement," 126 S. Ct. at 1208. As a result, despite protestations to the contrary, our decision today places us yet again in conflict with our sister circuits and likely on course for yet another reversal by the Supreme Court.

D

In addition to proffering her contract-of-adhesion argument, Nagrampa also contends that the arbitration clause alone is procedurally unconscionable because it is found on the twenty-fifth page of the thirty-page franchise agreement and because she was not informed about the clause or the

costs of arbitration. These claims pertain solely to the arbitration provision's validity and are thus cognizable under *Prima Paint* and *Buckeye*.

Nagrampa does not cite any authority for the proposition that MailCoups was required to apprise her of the existence of the arbitration clause or the costs associated with arbitration. Indeed, California case law establishes that MailCoups had no such obligation. In *Brookwood v. Bank of America*, 45 Cal. App. 4th 1667, 1672 (Ct. App. 1996), for example, an employee sought to obtain a judicial forum for her employment discrimination suit by claiming that she was not aware that her new-employee paperwork included an arbitration clause. The court rejected the employee's attempt to evade arbitration and explained that she "was bound by the provisions of the [arbitration] agreement regardless of whether [she] read it or [was] aware of the arbitration clause when [she] signed the document." *Id.* at 1674 (internal quotation marks omitted; alterations in original); *see also id.* ("Reasonable diligence requires the reading of a contract before signing it. A party cannot use his own lack of diligence to avoid an arbitration agreement." (internal quotation marks omitted)).

Here, MailCoups sent the franchise agreement to Nagrampa and asked her to return it with her signature. Nagrampa—an experienced businessperson who had worked for more than seven years in the direct marketing field—had ample opportunity to read the arbitration clause and to consider its implications; by her own admission, she had the franchise agreement containing the arbitration clause for nearly two months. It follows that this case is appreciably different from those in which an inexperienced consumer was pressured to sign an agreement without being afforded an opportunity to read or to comprehend the fine print. *See, e.g.*, *Gutierrez v. Autowest, Inc.*, 114 Cal. App. 4th 77, 89 (Ct. App. 2003) (holding that an arbitration clause in an automobile lease was procedurally unconscionable where the clause was "particularly inconspic-

uous," it was "printed in eight-point typeface on the opposite side of the signature page," and the consumer was not informed of the clause's existence). Nagrampa's failure to read the arbitration clause—or to consult a lawyer about its ramifications—does not excuse her from complying with its terms.[10] Thus, in my view, Nagrampa has failed to make any showing that the arbitration provision was procedurally unconscionable, and her claim of unconscionability cannot succeed because California law requires both procedural and substantive unconscionability.

## III

Though Nagrampa's unconscionability claim fails for the lack of procedural unconscionability, we may reject her arguments that the arbitration agreement is substantively unconscionable as well. As the majority notes, Nagrampa argued that the arbitration agreement was substantively unfair for three reasons. First, she asserted that the venue provision

---

[10]The majority concludes that *Brookwood* is inapplicable because "[t]he analysis of procedural unconscionability under California law focuses on the manner in which the contract or the disputed clause was presented and negotiated and the disparity in bargaining power, not on whether the party claiming procedural unconscionability should have known of the arbitral provision." Majority Opinion at 18928. But when the majority later argues that procedural unconscionability may exist even with sophisticated parties, it cites *A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 486 (4th Dist. 1982)), and states that the California Supreme Court "is among the many courts that 'have begun to recognize that experienced but legally unsophisticated businessmen may be unfairly surprised by unconscionable contract terms.' " Majority Opinion at 18926. On the one hand, the majority discounts foreknowledge as irrelevant; on the other hand, the majority enlists unfair surprise to support its conclusion regarding unconscionability. And the majority continues to discuss the importance of advance knowledge under California law when it concludes that Nagrampa received "inadequate notice" of the forum selection provision and therefore that the provision must be ignored "on public policy grounds." Majority Opinion at 18940-42. It is hard for the majority to say that *Brookwood* sheds no light on the case at bar, given the fact that the majority itself accords substantial weight to considerations of advance awareness.

defeated her ability to defend her claims. Second, she claimed that the agreement's fee-splitting provision was unconscionable. Third, she contended that the AAA was a repeat player and therefore biased against her.

A

I agree with the majority that Nagrampa's "repeat player" argument is without merit. *See* Majority Opinion at 18928-30.

Nagrampa contends that the AAA and its arbitrators have an interest in ruling in favor of "repeat players" such as Mail-Coups because corporate parties that frequently appear before the AAA will take their business elsewhere if they receive an adverse ruling. Nagrampa is unable, however, to muster any case law in which courts have questioned the neutrality of the AAA. Instead, she relies upon *Mercuro v. Superior Court*, which held that it was substantively unconscionable to require an employee to arbitrate his employment discrimination claim before the National Arbitration Forum because the employer benefitted from repeatedly appearing before the eight arbitrators the organization employed in the Central District of California. 96 Cal. App. 4th 167, 178 (Ct. App. 2002).

*Mercuro* is readily distinguishable because there is no evidence to suggest that the AAA uses a comparably small number of arbitrators or that MailCoups has repeatedly appeared before the organization. Moreover, the AAA Commercial Arbitration Rules incorporate safeguards to neutralize any bias in favor of repeat litigants, requiring arbitrators to "disclose to the AAA any circumstance likely to affect impartiality or independence, including . . . any past or present relationship with the parties or their representatives." *See* AAA Commercial Arbitration Rules, R-19(a). Because either party can then request that the arbitrator be removed from the matter, this rule minimizes the risk of a repeat player effect favoring corporate parties. *See* AAA Commercial Arbitration Rules, R-19(b).

Indeed, California courts have uniformly concluded that the AAA provides a neutral forum for dispute resolution. *See Armendariz*, 6 P.3d at 687-88 ("there are sufficient institutional safeguards, such as scrutiny by the plaintiff's bar and appointing agencies like the AAA, to protect against corrupt arbitrators"); *Izzi v. Mesquite Country Club*, 186 Cal. App. 3d 1309, 1318 (Ct. App. 1986) (stating that the AAA is not "presumptively biased against either party. The rules of the [AAA] specified by the clause as governing the resolution of disputes are generally regarded to be neutral and fair.").

Because there is neither case law nor record evidence supporting the proposition that the AAA is a biased forum, Nagrampa has failed to establish that the arbitration clause is substantively unconscionable on that basis.

B

I also agree with the majority that the fee-splitting provision of the arbitration clause is not substantively unconscionable, but I cannot agree that the provision could endanger Nagrampa's ability to vindicate her statutory rights.

Nagrampa argues that the arbitration clause is substantively unconscionable because it requires the parties to share the costs of arbitration.[11] Her argument is premised, however, upon an uncountenanced extension of California law.

---

[11]Nagrampa did not raise this argument in opposing MailCoups' motion to compel; she argued only that the arbitration clause failed to disclose the costs. Nowhere did Nagrampa contend that the fee-splitting provision imposed unconscionably high costs. She accordingly failed to cite any of the extensive California case law concerning the propriety of fee-splitting arrangements, and the district court had no opportunity to pass upon this issue. Therefore, Nagrampa waived it. *See In re Am. West Airlines, Inc.*, 217 F.3d 1161, 1165 (9th Cir. 2000) ("Absent exceptional circumstances, we generally will not consider arguments raised for the first time on appeal, although we have discretion to do so."). Notwithstanding the foregoing, because Nagrampa did raise the issue in her appellate opening brief, I will assume that the majority is exercising its discretion to consider the issue.

Much of Nagrampa's argument relies upon *Armendariz v. Foundation Health Psychcare Services, Inc.* and its progeny. 6 P.3d 669 (Cal. 2000). In *Armendariz*, the Supreme Court of California held that where an employer imposes mandatory arbitration as a condition of employment, the arbitration agreement cannot "require the employee to bear any type of expense that the employee would not be required to bear if he or she were free to bring the action in court." *Id.* at 687 (emphasis omitted). The *Armendariz* decision was strictly confined to the employment setting, and the Supreme Court of California recently refused to address whether its holding should be extended to other contexts. *See Cruz v. PacifiCare Health Sys., Inc.*, 66 P.3d 1157, 1165 n.3 (Cal. 2003). Further, as *Armendariz* recognized, California has established a default rule that explicitly calls for the parties to split both administrative and legal costs. Cal. Civ. Proc. Code § 1284.2. Therefore, the fee-splitting provision does not automatically render the parties' arbitration clause substantively unconscionable.

Neither have the fees in this particular case forced Nagrampa "to forgo unwaiveable public rights." Majority Opinion at 18941 (quoting *Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064, 1079 (2003)). In certain cases, a party may be entitled to fee allocation where it "is necessary to enable [ ] statutory rights to be vindicated." *Indep. Ass'n of Mailbox Ctr. Owners, Inc., v. Superior Court*, 133 Cal. App. 4th 396, 417 (Ct. App. 2005); *see also Gutierrez*, 114 Cal. App. 4th at 89 ("We conclude that where a consumer enters into an adhesive contract that mandates arbitration, it is unconscionable to condition that process on the consumer posting fees he or she cannot pay."). However, in *Mailbox Center*, the court was unable "to evaluate the financial capabilities of the franchisees," and so returned the case to the trial court for further hearings on the issue. 133 Cal. App. 4th at 417. Meanwhile, in *Gutierrez*, the plaintiffs "presented substantial evidence in the trial court that the administrative fees exceeded their ability to pay." *Gutierrez*, 114 Cal. App. 4th at 90. In any event,

the defendant in *Gutierrez* never contested the plaintiffs' inability to pay the fees. *Id.* at 91.

Nagrampa cannot present evidence that the arbitration fees would prevent her from vindicating her statutory rights, and MailCoups never conceded the issue, instead arguing that Nagrampa's bank account balance during the relevant time period belied her claim that she could not afford to pay the arbitration fees or to go to Boston. Nagrampa had an average balance of $16,000 in her personal bank account during the relevant time period, more than enough to pay the $6,500 in fees. In light of this, there is simply no basis for holding that the arbitration fees here were insurmountable or unreasonable.[12]

C

I must also disagree with the majority's conclusion that the venue provision—specifying Boston as the arbitration site—was unconscionable.

Nagrampa's argument on this point relies heavily upon *Bolter v. Superior Court*, 87 Cal. App. 4th 900 (Ct. App. 2001). There, the court held that a forum selection clause in a franchise agreement was unconscionable because it required California carpet-cleaning franchisees to arbitrate their claims against the franchisor in Utah. *Id.* at 909. In reaching this conclusion, the court emphasized that the parties' original franchise agreement did not contain either an arbitration clause or a forum selection provision and that the franchisees therefore could not have anticipated that they would be required to

---

[12]For the same reason, I reject the majority's contention that the forum selection clause might "substantially diminish [Nagrampa's] rights." Unlike the plaintiffs in *America Online, Inc. v. Superior Court*, 90 Cal. App. 4th 1, 15 (Ct. App. 2001), who would receive "significantly less consumer protection" under Virginia law when compared to California law, Nagrampa cannot point to any injury she will suffer from arbitrating in Boston, particularly where MailCoups conceded at oral argument that it is not contesting the applicability of California law.

travel to an inconvenient location to arbitrate their claims. *Id.* The franchisor added the forum selection clause to subsequent versions of the contract, to which the franchisees were required to give their assent if they wished to keep their businesses. *Id.* at 907. The court specifically noted that "[o]nly a person contemplating whether to purchase a franchise for the first time would have been in the position to reject [the franchisor's] 'take it or leave it' attitude." *Id.*

Where *Bolter*'s extenuating circumstances are absent, however, California courts have sustained the validity of forum selection clauses in franchise agreements. In *Lu v. Dryclean-U.S.A. of California, Inc.*, for example, the court upheld a clause requiring California franchisees to litigate claims against their franchisor in Florida. 11 Cal. App. 4th 1490, 1493 (Ct. App. 1992). The court held that it was reasonable for the franchisor, which had its principal place of business in Miami, to designate Florida as the forum for all litigation. *Id.* at 1493 n.2. The court explained that "[m]ere inconvenience or additional expense is not the test of [the forum selection clause's] unreasonableness since it may be assumed that the plaintiff received under the contract consideration for these things." *Id.* at 1493 (internal quotation marks omitted).

Nagrampa's situation is comparable to that of the franchisees in *Lu*, because—as the district court recognized—the oppressive features of the *Bolter* case are absent from Mail-Coups' franchise agreement. Like in *Lu*, MailCoups' designation of Boston as the arbitration site is reasonable, as Boston is MailCoups' principal place of business. Unlike in *Bolter*, the provision designating Boston as the arbitration forum was included in the original franchise agreement presented to Nagrampa, and she thus knew—or, if she neglected to read the agreement, she should have known—that the contract included a forum selection clause. Moreover, the franchisees in *Bolter* introduced evidence suggesting that they would have been financially unable to pursue their claims against the franchisor if they were required to arbitrate in Utah. 87 Cal.

App. 4th at 909-10. The limited financial evidence presented by Nagrampa does not establish that her financial situation precludes her from traveling to Boston for the arbitration. The forum selection clause therefore is not substantively unconscionable.[13]

Because Nagrampa had sufficient funds to pursue her claim against MailCoups even in Boston, there is no danger that the venue provision would "impede Nagrampa from vindicating statutory rights." Majority Opinion at 18929. There is no reason to consider Boston "a location so prohibitively costly to Nagrampa" that she could not participate. *Id.* at 18937. Nagrampa had the funds to participate and chose not to. The majority's assertion to the contrary, that Nagrampa "may not be able to maintain her claim to recover any of her losses if forced to do so in Massachusetts," is directly contrary to the record. *Id.* Any such claim is also flimsy given the amounts

---

[13]The majority's reliance on *Laxmi Investments, LLC v. Golf USA*, 193 F.3d 1095 (9th Cir. 1999), is curious, particularly with respect to its analysis of the franchise-offering circular. Nagrampa never cited to this circular or argued that the statements in the circular had rendered it impossible for the parties to reach a "meeting of the minds" on venue. Indeed, she did not include the offering circular in her excerpts of record, and every statement made in her briefs concerned the "contract." Thus, to the extent she *ever* made any argument regarding the offering circular, she has arguably waived it. Perhaps more importantly, the franchise agreement here states that the "Agreement . . . constitutes the entire agreement between Mail-Coups and Franchisee as to the . . . franchise and supersedes all prior negotiations, understandings, representations and agreements, if any." Thus, any reliance on the circular is foreclosed based on the franchise agreement's integration clause. "Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." Cal. Civ. Proc. Code § 1856(a).

Even if the forum selection clause were substantively unconscionable, the appropriate remedy would be for this Court to sever that provision, rather than to invalidate the arbitration clause in its entirety. *See Bolter*, 87 Cal. App. 4th at 910 ("the unconscionable provisions can be severed and the rest of the agreement enforced").

of money that were involved in the franchise. Nagrampa claims that she paid more than $400,000 in fees to MailCoups over her franchise's brief two-year existence, all while receiving no personal income. To claim now that the cost of a round-trip plane ticket from San Francisco to Boston ($338.60), a four-night hotel stay ($316.00), and twelve meals ($160.00), will prevent her from vindicating her statutory rights (priceless) is laughable.[14]

The arbitration provision's specification of a Boston venue is not unconscionable, nor will it result in the waiver of Nagrampa's statutory rights.

D

Inexplicably, the majority manufactures an argument that was never raised by either party. Without explanation as to why it decided to create a new issue, the majority concludes that the burden of proof is on MailCoups to establish that the venue provision will not diminish Nagrampa's substantive rights as a California franchisee. While her original complaint alleged violations of the statutes cited by the majority, Nagrampa never argued that these statutes shifted the burden to MailCoups while before the district court, in her opening brief here, in front of the three-judge panel, or before the en banc panel.

Pursuant to Federal Rule of Appellate Procedure 28, our usual practice is to require parties to make an argument con-

---

[14]The arbitration in this case was scheduled to last only two days. The price of a round-trip ticket from San Francisco to Boston on American Airlines is $338.60, assuming Sunday departure and Wednesday return and sufficient advance notice. *See* www.mobissimo.com. The La Quinta in Somerville, Massachusetts, approximately seven minutes from the AAA's downtown Boston office, charges $79 per night. *See* www.lq.com. As Rachael Ray demonstrated, one can eat well in Boston on $40 per day. *See* $40 a Day: Boston, http://www.foodnetwork.com/food/show_ad/episo de/0,1976,FOOD_9947_22423,00.html.

taining their "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." We generally enforce this rule by reviewing "only issues argued specifically and distinctly in a party's opening brief." *Greenwood v. FAA,* 28 F.3d 971, 977 (9th Cir. 1994); *see also Carroll v. Nakatani*, 342 F.3d 934, 944 (9th Cir. 2003) (same); *United States v. Hernandez-Valdovinos*, 352 F.3d 1243, 1248 n.4 (9th Cir. 2003) ("Issues that were not presented to the district court generally cannot be raised for the first time on appeal."). Indeed, we have refused to "manufacture arguments" for a party who offers only bare assertions. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).

Here the majority manufactures an argument for Nagrampa that lacks even so much as a bare assertion in support. I am puzzled; I would have expected a reasoned explanation for such a drastic departure from our past precedent and practice. I continue to believe that "[a]s judges, the essence of our role is restrained service as impartial arbiters of disputes framed by litigants. It is not, I respectfully suggest, to act as backup counsel when litigants make poor arguments, or when they come into court without first having 'figure[d] out' their cases." *Kennedy v. Lockyer*, 379 F.3d 1041, 1065 (9th Cir. 2004) (O'Scannlain, J., dissenting). There is no justification for creating new issues or new arguments to resolve this case, especially when MailCoups lacks a meaningful opportunity to be heard on these issues.

Thus, I would avoid this issue entirely and hold that it was waived by the parties.

IV

In summary, I continue to believe that we ignore the Supreme Court's direction in *Prima Paint* and *Buckeye* at our peril when we choose to consider Nagrampa's contract-of-adhesion claim. In any event, the arbitration clause here was

neither procedurally nor substantively unconscionable. I would therefore affirm the judgment of the district court.

I respectfully dissent.

---

KOZINSKI, Circuit Judge, with whom Judges O'SCANNLAIN and TALLMAN join, and with whom Judge CLIFTON joins as to Part II, dissenting:

I agree with Judge O'Scannlain that Nagrampa's unconscionability challenge should have been decided by an arbitrator, and that her contract with MailCoups was not substantively unconscionable. I write separately to dispute the majority's conclusion that Nagrampa did not waive the right to contest arbitrability after participating in the arbitration proceedings for almost a year, and its finding that the arbitration was procedurally unconscionable.

## I.   Waiver

The majority reads Nagrampa's February 6, 2002, letter to the arbitrator as a "forceful" objection to arbitrability. Maj. at 18920. But Nagrampa never *said* she objected—she merely expressed "serious concerns" about the "validity" of the arbitration clause. This statement contained none of the traditional indicia of a properly articulated objection. She never said "I object," and she provided no grounds for her purported concerns. Most significantly, she never submitted the issue to the arbitrator.

For an example of a real objection, we need look no farther than that same letter, where Nagrampa clearly states that she "objects" to MailCoups's proposal to hold the arbitration in Los Angeles. MailCoups and the arbitrator recognized this as an objection, and everyone spent the better part of the next eight months dealing with the matter. The parties submitted

written statements and argued by way of telephone conference about where the proceedings should be held.[1] The arbitrator recognized his duty to resolve the issue and ultimately did so by issuing a formal ruling on the matter.

There was no similar response to Nagrampa's "concerns" about arbitrability. MailCoups never briefed the issue, and the arbitrator never ruled on it. And Nagrampa never explained her legal theory or any facts on which her concerns were based. Had they thought that Nagrampa was actually objecting to arbitrability, MailCoups and the arbitrator would certainly have turned to this issue first, rather than wasting months resolving matters that are of no consequence if the contract is not arbitrable in the first place. That Nagrampa's expression of "concerns" was met with silence, and that she did nothing to press an arbitrability claim, fatally undermines the majority's conclusion that Nagrampa preserved her objection by presenting it to the arbitrator.[2]

While Nagrampa failed to make the faintest allusion to her "concerns" about arbitrability during the course of the arbitration, she showed no such reticence when dealing with other issues. In addition to fighting tooth-and-nail over venue, she filed a broad discovery request, pressed four counterclaims

---

[1]The majority says there were two conference calls, maj. at 18917, but MailCoups's attorney asserts that Nagrampa or her lawyer participated in at least three calls, and Nagrampa does not contest this assertion in her brief.

[2]Even if one reads the February 6, 2002, letter as objecting to arbitrability, I'm not sure how it helps Nagrampa. All it would mean is that Nagrampa submitted the question to the arbitrator, thereby acquiescing in his authority to decide the issue. It would certainly not preserve her right to withdraw from the arbitration and have the arbitrability issue decided de novo by a court. Because, unlike the respondent in *First Options of Chicago, Inc.* v. *Kaplan*, 514 U.S. 938, 941 (1995), Nagrampa consented to arbitration, she was not entitled to submit a question to the arbitrator yet retain the right to de novo consideration of the same issue in judicial proceedings.

and sought to have fees waived. The majority dismisses these activities as mere "procedural skirmishes," but the record shows that Nagrampa's participation went to the heart of her dispute with MailCoups. Take the discovery request: Nagrampa asked for all documents describing "assumptions made by Claimant in preparing the Earnings Claims" set forth in the franchise offering circular, the economic and marketing conditions existing at the time the offer was made and the financial status of MailCoups's existing franchisees. This is far more information than Nagrampa would have needed to contest arbitrability; it is information that would only have been useful to her in litigating her case on the merits. When the time came for raising counterclaims, Nagrampa didn't elaborate on her "concerns" about arbitrability. Instead, she claimed that MailCoups violated multiple provisions of California's franchise law. Nagrampa's actions bespeak not only acquiescence in the arbitrator's authority, but a desire to be a full participant in the proceedings.

Thus, even if we could somehow read the February 6, 2002, letter as objecting to arbitrability, we must still consider whether Nagrampa's participation in the proceedings on matters that have no conceivable bearing on arbitrability was so extensive as to waive any right she may have had to withdraw. Waiver doctrine in this context is guided by the practical policies of the Federal Arbitration Act, which is designed to give businesses access to a cheap and speedy means of resolving disputes. *See Dean Witter Reynolds, Inc.* v. *Byrd*, 470 U.S. 213, 218-19 (1985). When a party actively participates in the arbitration process for many months and then suddenly withdraws, it wastes valuable time and resources. As we stated in *Fortune, Alsweet & Eldridge, Inc.* v. *Daniel*, 724 F.2d 1355 (9th Cir. 1983) (per curiam), "[i]t would be unreasonable and unjust to allow [a party] to challenge the legitimacy of the arbitration process, in which he had voluntarily participated over a period of several months . . . ." *Id.* at 1357; *see also Comprehensive Accounting Corp.* v. *Rudell*, 760 F.2d 138, 140 (7th Cir. 1985) ("It was then too late for [the parties

contesting arbitrability] to sit back and allow the arbitration to go forward, and only after it was all done, and enforcement was sought, say: oh by the way, we never agreed to the arbitration clause. That is a tactic that the law of arbitration, with its commitment to speed, will not tolerate.").

The majority discounts Nagrampa's participation in the proceedings, because she never participated in a merits hearing. But I don't see why it should matter whether the hearings in which Nagrampa or her lawyer participated were on the merits or preliminary matters; in either event, the opposing party suffered the unfairness of unnecessary cost and delay. None of the cases on which the majority relies holds that participation in the merits hearings is necessary for waiver. *See First Options*, 514 U.S. at 946[3]; *Textile Unlimited, Inc.* v. *A..BMH & Co.*, 240 F.3d 781, 788 (9th Cir. 2001); *Fortune*, 724 F.2d at 1357; *Ficek* v. *S. Pac. Co*, 338 F.2d 655, 657 (9th Cir. 1964). And the two cases on which the majority relies most heavily, *First Options* and *Textile Unlimited*, don't deal with waiver at all, but rather with what conduct amounts to consent to arbitrate where there is no written agreement to do so. *See First Options*, 514 U.S. at 941; *Textile Unlimited*, 240 F.3d at 788.[4] As the record in this case demonstrates, parties

---

[3]*First Options* is particularly unhelpful to the majority, even if it were on point. *But see* note 4 *infra*. The party objecting to arbitrability in *First Options* appeared *only* to contest arbitrability; he did not participate in any other aspect of the arbitration. 514 U.S. at 940-41 (explaining that the Kaplans made an objection to arbitrability in their personal capacities while Mr. Kaplan participated only as the principal shareholder of his company for the remainder of the proceedings).

[4]Contrary to what the majority claims, consent and waiver are quite different. There is no presumption that parties have consented to arbitration and thus the party wishing to establish consent by conduct must do so by making a clear showing that the opposing party's conduct amounts to consent. *First Options*, 514 U.S. at 944. But where the parties have consented to arbitration by contract, as they did here, there is a presumption that all issues between them are to be decided by the arbitrator. *Id.* In such circumstances, the party attempting to withdraw a question from arbitration must affirmatively establish that it preserved the right to do so. Thus, conduct that is insufficient to establish consent may be more than sufficient to establish waiver.

can waste considerable time and money before ever getting to a hearing on the merits. It is contrary to the policies of the Arbitration Act to hold, as the majority does, that waiver can only occur once an arbitrator hears the merits, no matter how deeply a party gets involved in the arbitration process. It is also significant that Nagrampa didn't attempt to get out of the arbitration until she lost on venue and hired a new lawyer—at which point, she picked up her marbles and left. Waiver doctrine, with its emphasis on fairness and efficiency, should discourage such gamesmanship. And before today's decision, such was the law in this circuit. *See Ficek*, 338 F.2d at 657 ("A claimant may not voluntarily submit his claim to arbitration, await the outcome, and, if the decision is unfavorable, then challenge the authority of the arbitrators to act."). The majority's ruling that there can be no waiver until the merits hearings means that parties can never be sure, until that point, that they are litigating in the right forum. No matter how much time and effort are spent in pre-merits proceedings, the opposing party retains the right to abort the proceedings and leave the other side behind to pay the fees. This rule contradicts our caselaw and the policies of the Arbitration Act, which seeks to promote swift and inexpensive resolution of commercial disputes.

## II.   Procedural Unconscionability

After some handwringing, the majority finds that Nagrampa has presented "minimal" evidence of procedural unconscionability, but even this is an overstatement. To show procedural unconscionability, Nagrampa was required to prove surprise or oppression. *Armendariz* v. *Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 690 (Cal. 2000). She comes nowhere close. First as to surprise: Nagrampa had the contract for almost two months before she signed it, ample time to read and digest its contents. She could afford to consult a lawyer and had every incentive to do so. She was not purchasing cell phone service or an everyday consumer good —she was leaving a secure, six-figure job to invest her future

in a national franchise with one of her employer's competi- tors. Nagrampa admits that she carefully reviewed the finan- cial elements of the contract and obtained confirmation of her anticipated profit margin. She declared under penalty of per- jury that she had read the agreement. Nagrampa doesn't claim that she was unaware of the arbitration clause when she signed the contract. What Nagrampa does claim is that she was "never informed" of the arbitration clause. This claim is specious. Page one of the offering circular contains a heading labeled "Risk Factors," the first of which reads as follows:

> THE FRANCHISE AGREEMENT REQUIRES YOU TO ARBITRATE AND SUE IN MASSA- CHUSETTS. OUT-OF-STATE ARBITRATION OR LITIGATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT. IT MAY ALSO COST YOU MORE TO ARBITRATE OR LITIGATE WITH US IN MASSACHUSETTS THAN IN YOUR HOME STATE.

You'd have to be blind to miss this warning. There was no surprise here.

So if this agreement is procedurally unconscionable, it must be because Nagrampa was somehow oppressed. The majority finds oppression because of the great financial disparity between MailCoups and Nagrampa, and because MailCoups presented Nagrampa with a form contract, the terms of which were non-negotiable. But, these conditions are *always* present where an individual signs up for a franchise, and yet "[f]ranchise agreements are not per se unenforceable" in Cali- fornia. Maj. at 18920 (quoting *Indep. Ass'n of Mailbox Ctr. Owners, Inc.* v. *Superior Court*, 133 Cal. App. 4th 396, 407 (4th Dist. 2005) (internal quotation marks omitted)).

Franchisors are typically large enterprises with an estab- lished business model and a suite of products and services that enjoy widespread—often nationwide—recognition. That's the

very point of buying a franchise rather than starting a business from scratch. Franchisees tend to be individuals or families who hope to achieve economic self-sufficiency by marketing the franchisor's products and services. The franchisor invariably has financial resources that far exceed those of the prospective franchisee, but "large business entities may have *relatively* little bargaining power, depending on the identity of the other contracting party and the commercial circumstances surrounding the agreement." *A&M Produce Co.* v. *FMC Corp.*, 135 Cal. App. 3d 473, 489-90 (Ct. App. 1982).

Likewise, franchise agreements are typically offered by means of form contracts, consistent with the standardized nature of the franchise business model. And, California courts have recognized that "the fact that [a] provision for arbitration is contained in a contract of adhesion will not, of itself, render the provision unenforceable." *Keating* v. *Superior Court*, 645 P.2d 1192, 1198 (Cal. 1982), *rev'd on other grounds*, *Southland Corp.* v. *Keating*, 465 U.S. 1 (1984). So, if franchise agreements in general and form arbitration clauses in particular are not per se oppressive, we must find a way to separate enforceable agreements from those that are not. To do this, we must examine closely the facts and circumstances of *this* negotiation. When we do so, it is perfectly clear Nagrampa was not oppressed.

First, Nagrampa is a sophisticated businesswoman with special expertise in the direct mail business. In her complaint, Nagrampa states: "On or about July 1998 plaintiff prepared a spreadsheet reflecting her prospective costs and profits based on conversations with MAILCOUPS INC.'s agent . . . ." In her declaration, she states:

> I reviewed the materials from SuperCoups and discovered that instead of calculating costs on a line by line basis, SuperCoups charged its franchisees an inflated lump sum that is later reduced by postage overcharge refund and other production credits.

The majority's romantic vision of Nagrampa as a modern-day Candide is shattered by her ability to do complicated financial forecasting and her easy use of terms such as "inflated lump sum," "postage overcharge refund" and "production credits." In reality, Nagrampa was a savvy businesswoman who knew the direct mail industry inside and out, and was more than capable of taking care of herself. To suggest otherwise denies Nagrampa the respect a woman in her position deserves.

All this is easily dismissed, according to the majority, because Nagrampa "apparently" didn't have "specialized education or training in the field." Maj. at 18926. But even if this were supported by the record—and I've found nothing to support it—it's not clear why it matters. Nagrampa obviously had what it takes to be a high-level executive in this very industry. Whether she gained these skills through formal training, experience, a knack for business, or a combination of the three, the point is that if Nagrampa was not sophisticated enough to sign up as a direct-mail franchisee, nobody is.

It's also significant that Nagrampa was under no economic pressure because she held a lucrative job with another company. That Nagrampa continued to work at her six-figure job while she considered whether to sign the contract meant that she was negotiating from a position of strength. She could have easily said "no" at any time and sought another franchise opportunity or kept her job and six-figure salary. California courts have recognized that inequality of bargaining power "depends in part on the absence of meaningful choice by a contracting party; and even though a contract may be adhesive, the existence of 'meaningful' alternatives available to such contracting party in the form of other sources of supply tends to defeat any claim of unconscionability." *Dean Witter Reynolds, Inc.* v. *Superior Court*, 211 Cal. App. 3d 758, 771 (Ct. App. 1989).

The majority tries to distinguish *Dean Witter* by pointing out that the attorney there "had a great degree of experience

with financial service contracts," maj. at 18926, but misses the point of that case entirely. In *Dean Witter*, the plaintiff, an attorney who specialized in litigation against financial institutions, purchased a self-directed IRA from Dean Witter and sued to contest the contract's fee provisions. *Dean Witter*, 211 Cal. App. 3d at 762. The court held the contract was not procedurally unconscionable, because plaintiff had failed to show "lack [of] a meaningful choice" in where to purchase an IRA. *Id.* at 772. That the plaintiff in *Dean Witter* was an experienced lawyer while Nagrampa is an experienced businesswoman is a distinction without a difference. Just as the plaintiff in *Dean Witter* could have purchased an IRA from another financial institution, so Nagrampa could have looked for another franchisor—all the while continuing to draw her salary. *Dean Witter* cites numerous cases, from California and elsewhere, that reach precisely the same conclusion: A party who has a meaningful choice cannot be oppressed. *See id.* at 769-72 (citing *Kurashige* v. *Indian Dunes, Inc.*, 200 Cal. App. 3d 606, 614 (Ct. App. 1988); *Parr* v. *Superior Court*, 139 Cal. App. 3d 440, 444 (Ct. App. 1983); *Henningsen* v. *Bloomfield Motors, Inc.*, 161 A.2d 69, 87, 94 (N.J. 1960)).

*Stirlen* v. *Supercuts, Inc.*, 51 Cal. App. 4th 1519 (Ct. App. 1997), turns on this very point. In *Stirlen*, the corporation did not disclose the arbitration requirement to a sophisticated executive until *after* he had already accepted employment with the defendant. *Id.* at 1534. By that time, he had quit his previous "highly paid position with a major corporation," *id.* at 1533, and thus was dependent on his new job for his livelihood. That is a very different situation from the one here, where Nagrampa could have rejected the franchise agreement and still have had an income with which to pay the mortgage and put food on the table.

Our case is the antithesis of *Stirlen*. As Nagrampa admits, MailCoups approached *her* about the possibility of opening a franchise and pursued her aggressively to keep the negotiations alive. As the solicited party, with a good income and a

secure job with one of MailCoups's competitors, Nagrampa held the trump card in the negotiations: She could have "just said no," and forced MailCoups to go scrambling for the business partner it seems to have desperately needed. Walking away from the deal would have caused her no loss of livelihood, no inconvenience of any sort, since her sole motivating factors were self-interest and ambition. These are swell reasons, to be sure, but hardly the stuff of economic duress. Under these circumstances, I cannot conclude that the contract negotiations were oppressive, nor that the resulting contract was procedurally unconscionable.

I'd be much less troubled by the majority's contrary conclusion if my colleagues took seriously the sliding scale test they discuss in the procedural unconscionability section of the opinion. Maj. at 18922. After all, the difference between no procedural unconscionability (as I see it) and "minimal" or "slight" procedural unconscionability (as the majority sees it) should make no difference unless there is evidence of overwhelming substantive unconscionability to offset the "minimal" showing on the procedural side of the scale. And, as Judge O'Scannlain shows, if there is substantive unconscionability at all, it is nowhere near overwhelming; the majority doesn't even pretend that it is.

As it is, the majority pays only lip service to the sliding scale test. It briefly discusses the test in the procedural unconscionability part of its opinion, but then forgets all about it when it gets to the other end of the sliding scale. The majority does say that the evidence of substantive unconscionability is "strong enough" to offset the "slight" evidence of procedural unconscionability. Maj. at 18943. But this merely states the conclusion the majority wants to reach; it does not explain why the substantive unconscionability it finds is of such a "high degree" as to offset the "slight" or "minimal" degree of procedural unconscionability. *See, e.g.*, *Nyulassy* v. *Lockheed Martin Corp.*, 120 Cal. App. 4th 1267, 1286-87 (Ct. App. 2004).

So what we're left with is a sophisticated executive who willingly left a six-figure job to buy a franchise in an industry where she'd been doing business for years. There was no coercion, surprise or duress in the negotiations—indeed, Nagrampa was being aggressively courted by MailCoups. She had the contract for two months before she signed it and could have taken longer if she'd liked. But because she might be forced to spend something like $800, *see* O'Scannlain dissent at 18966, in order to arbitrate in the venue she freely agreed to, the arbitration clause is thrown out the window.

As with most paternalistic endeavors, the majority's opinion carries the seeds of great irony. By invoking the unconscionability doctrine to protect "the little guy" in this case, the majority has construed California franchise law in a way that will result in fewer opportunities for other "little guys" in the future. The ever-growing cost of litigation is one of the most serious and uncontrollable risks faced by modern businesses. As the California courts have recognized, arbitration helps businesses manage this risk by "providing for resolution of disputes in a presumptively less costly, more expeditious, and more private manner by an impartial person or persons typically selected by the parties themselves." *Keating*, 645 P.2d at 1198. But, according to the majority, only those who already control the means of production or possess vast economic resources on par with those of a major corporation are sophisticated enough to enter into enforceable arbitration agreements. This undermines the important policies of the Arbitration Act, denying potential first-time business owners the very benefits Congress meant to secure for them. The result is that fewer aspiring business owners—many of whom are minorities and first generation Americans—will find franchisors willing to offer them opportunities like the one MailCoups offered to Nagrampa.

While I believe that this contract is entirely valid under California law as construed by the courts in that state, the majority's exegesis of unconscionability doctrine does point

to a disturbing trend of judicial hostility to form contracts. Commercial transactions today are typically governed by standardized contracts, the terms of which are non-negotiable. The era of the individually-negotiated contract—like that of the hand-crafted flivver—is fading from living memory. As the majority opinion demonstrates, however, California courts have shown a lamentable tendency to hold the arbitration clauses in such contracts unenforceable. The effect of these developments is that such provisions are now easily challenged on grounds of unconscionability, routinely channeling contract disputes away from arbitrators and into the courts. *Buckeye Check Cashing, Inc.* v. *Cardegna*, 126 S. Ct. 1204, 1209 (2006), stands squarely for the proposition that state law may not be used to so easily divest arbitrators of their authority. I would not be the least surprised to see the Supreme Court of the United States soon take a close look at whether the unconscionability doctrine, as developed by some state courts, undermines the important policies of the Arbitration Act.